Filed 1/30/26  P. v. Garcia CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>NOE HERNANDEZ GARCIA,<br><br>    Defendant and Appellant. | H047489<br>(Santa Clara County<br>Super. Ct. No. 214763) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANDY GOMEZ,<br><br>    Defendant and Appellant. | H047844<br>(Santa Clara County<br>Super. Ct. No. 214763) |

In 2017, a jury convicted defendants Noe Hernandez Garcia[1] and Andy Gomez (collectively "defendants") of one count of first degree premeditated murder (Pen. Code, § 187)[2] along with firearm offenses.  The jury also found true gang enhancements and

---

[1] In the record on appeal, Hernandez Garcia's name is sometimes hyphenated "Hernandez-Garcia."  We have adopted "Hernandez Garcia."

[2] Unspecified statutory references are to the Penal Code.

gang-related firearm enhancements associated with those convictions. The trial court sentenced the defendants to identical indeterminate terms of 50 years to life plus determinate terms of three years.

Individually, Hernandez Garcia raises the following claims of error: 1) his conviction for murder is no longer valid due to changes in the law of murder that occurred following his conviction and sentencing; 2) the trial court erred in admitting Gomez's statements, made to a cooperating witness, as evidence against Hernandez Garcia; and 3) he is entitled to resentencing on his firearm convictions due to the intervening amendments to section 1170.[3]

After briefing was complete, we requested that Hernandez Garcia and the Attorney General submit supplemental briefing on the following issues: "1. Explain the theory or theories of first degree murder liability (Pen. Code, § 189, subd. (a)) upon which the People relied in prosecuting this case against Hernandez-Garcia [*sic*]. [¶] 2. To the extent that the People sought to convict Hernandez-Garcia [*sic*] of willful, premeditated, and deliberate first degree murder, discuss the impact of the trial court's failure to instruct the jury with the meanings of 'willfully,' 'deliberately,' and 'with premeditation,' as set forth in CALCRIM No. 521 and as discussed in *People v. Pearson* (2013) 56 Cal.4th 393, 443–444 and *People v. Anderson* (1968) 70 Cal.2d 15, 26–27. [¶] 3. To the extent that the People sought to convict Hernandez-Garcia [*sic*] of first degree murder as an aider and abettor, discuss the impact of the trial court's failure to instruct the jury on that theory of murder liability, as set forth in CALCRIM Nos. 400 and 401 and as discussed in *People v. Beeman* (1984) 35 Cal.3d 547, 560–561."

---

[3] Although Gomez did not make this argument in his briefing, he was also sentenced to upper terms on counts 7 and 9. As we will reverse Gomez's convictions on those counts due to instructional error, the trial court will be able to resentence him under current law if he is again convicted following a possible retrial.

We conclude that Hernandez Garcia's convictions for first degree murder (count 1), carrying an unregistered firearm (count 6), and being a criminal street gang member in possession of a loaded firearm in public (count 10)[4] must be reversed based on instructional error. As we are reversing Hernandez Garcia's convictions on all counts for possible retrial and resentencing on any ensuing convictions, we need not and do not reach his additional claims of error.

Gomez raises the following separate arguments: 1) the trial court failed to instruct the jury on the two charged firearms offenses; 2) the trial court improperly admitted evidence of a prior uncharged offense to prove the gang enhancement allegations and the charge of carrying a firearm while being an active gang member; 3) changes in the law relating to the gang enhancements and gang-related firearm enhancements require that the jury's true findings on those allegations must be vacated; 4) the trial court erred by excluding third party culpability evidence; 5) the trial court improperly admonished the jury to not consider third party motives; 6) the trial court erred by denying his motion for a new trial based on juror misconduct; 7) the trial court erred by failing to provide an exhibit to the jury during deliberations; and 8) the case must be remanded so that he may make a record of factors relevant to a future parole hearing, pursuant to *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*).

As to Gomez, we agree, as does the Attorney General, that the trial court failed to instruct the jury on Gomez's charged firearm offenses (counts 7 and 9) and those convictions must be vacated. We further agree that the jury's true findings on the gang enhancements and gang-related firearm enhancements must be vacated due to changes in

---

[4] Although Hernandez Garcia did not join in Gomez's argument that the trial court failed to instruct the jury on the charged firearm offenses, the Attorney General conceded that issue. "[A]n instructional error or omission that amounts to the *total* deprivation of a jury trial would be structural error, that is, reversible per se." (*People v. Merritt* (2017) 2 Cal.5th 819, 830 (*Merritt*).) Accordingly, Hernandez Garcia's convictions on the firearm offenses (counts 6 and 10) must also be reversed.

the law relating to those enhancements. On remand, the People may elect to retry the firearm offenses and gang enhancements.

We reject Gomez's remaining claims of error. However, because we are reversing and remanding the matter to the trial court for possible retrial of the firearm offenses and gang enhancements, Gomez may request a *Franklin* hearing in connection with any subsequent resentencing proceeding.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedural background

On June 4, 2015, the Santa Clara County grand jury indicted Gomez and Hernandez Garcia, along with codefendant Jose Gonzalez,[5] on one count of murder (§ 187; count 1), four counts of attempted murder (§§ 187, 664; counts 2, 3, 4, and 5), one count of carrying an unregistered loaded firearm (former § 12031, subd. (a)(1), [now § 25850, subds. (a), (c)(6), added by Stats. 2010, ch. 711, § 6]; counts 6 [Hernandez Garcia], 7 [Gomez], and 8 [Gonzalez]), and one count of being an active criminal street gang member in possession of a loaded firearm in public (§ 25850, subd. (a); counts 9 [Gomez] and 10 [Hernandez Garcia].)[6] The indictment further alleged gang-related firearm enhancements (§ 12022.53, subd (d)) in connection with counts 1 through 5, and criminal street gang enhancements as to counts 1 through 8 (§ 186.22, subd. (b)(5)).

After a trial, the jury found Hernandez Garcia and Gomez guilty of first degree murder (count 1), carrying an unregistered firearm (counts 6 and 7), and being a criminal street gang member in possession of a loaded firearm in public (counts 9 and 10). The jury also found true the allegation that the murder in count 1 was willful, deliberate, and

---

[5] Specifically, Gonzalez was charged with murder (count 1), four counts of attempted murder (counts 2, 3, 4, and 5), and one count of carrying an unregistered loaded firearm (count 8).

[6] The offenses in counts 9 and 10 were alleged to have occurred on July 13, 2012, the date on which Hernandez Garcia and Gomez were arrested.

premeditated and further found true the gang-related enhancements associated with each of those counts (i.e., counts 1, 6, 7, 9 and 10). The jury acquitted Hernandez Garcia and Gomez of all four counts of attempted murder (counts 2, 3, 4, and 5) and acquitted their codefendant Gonzalez on all counts.

On June 17, 2019, the trial court sentenced Hernandez Garcia to a total indeterminate term of 50 years to life in prison, consisting of a term of 25 years to life for the first degree murder conviction (count 1) with a consecutive term of 25 years to life due to the gang-related firearm enhancement (§ 12022.53, subd (d)), with an additional consecutive determinate upper term of three years on the conviction for being a criminal street gang member in possession of a loaded firearm in public (count 10). The court imposed, but stayed pursuant to section 654, a determinate term of seven years on the conviction for carrying an unregistered firearm (count 6), consisting of the upper term of three years plus a consecutive upper term of four years for the criminal street gang enhancement (§ 186.22, subd. (b)(5)). The trial court awarded Hernandez Garcia 1,095 days of custody credit on count 10 and 1,436 days of custody credit on count 1.

On December 9, 2019, the trial court sentenced Gomez to an indeterminate term of 50 years to life, consisting of a term of 25 years to life for the first degree murder conviction (count 1) with a consecutive term of 25 years to life due to the gang-related firearm enhancement (§ 12022.53, subd (d)), with an additional consecutive determinate upper term of three years on the conviction for being a criminal street gang member in possession of a loaded firearm in public (count 9). The court imposed but stayed, pursuant to section 654, a determinate term of seven years on the conviction for carrying an unregistered firearm (count 7), consisting of the upper term of three years plus a consecutive upper term of four years for the criminal street gang enhancement (§ 186.22, subd. (b)(5)). The trial court also awarded Gomez 1,095 days of custody credit on count 9 and 1,611 days of custody credit on count 1.

Hernandez Garcia and Gomez timely appealed.

### B. Factual background[7]

On October 17, 2011, at 8:57 p.m., the 18-year-old victim, Hanzel Perez, was standing outside his home on Ross Circle in San Jose with his brother and several friends when he was shot multiple times and killed.

#### 1. Prosecution's case

##### a. Neighborhood witnesses' testimony about the shooting

On October 17, 2011, E.G. and her husband, F.N., were outside their home on Ross Circle when E.G. heard gunshots and yelling nearby. E.G. told her children, who were playing nearby in a park in the center of Ross Circle, to run to her and she went with them inside her apartment. E.G. could not see any people or vehicles on the opposite side of Ross Circle because of tall bushes in the park. E.G. went outside again and saw her apartment manager, B.B., holding a phone to her ear and E.G. understood B.B. was calling the police.

A few minutes before she heard the gunshots, E.G. saw a car drive past with one man sitting on the hood and several other men inside, listening to music.

F.N. testified that he was outside with E.G., watching their children play in the park on the evening of October 17, 2011. F.N. saw a white Jetta with tinted windows parked about a hundred feet away from him on Ross Circle. He could see two figures inside the vehicle and F.N. testified there was no music coming from the car. F.N. told police that he saw the vehicle driving past his apartment and, about two minutes later, F.N heard gunshots and screaming from the other side of the park. However, he could not see anything because the high bushes in the park blocked his view.

B.B. testified she was on the walkway in front of the apartments on the evening of October 17, 2011. She saw a small white Toyota driving slowly past playing music.

---

[7] We refer to the lay witnesses and the victims, aside from the homicide victim, by their initials to protect their privacy interests. (Cal. Rules of Court, rule 8.90(b)(4), (10).)

6

B.B. testified there were three people inside the car, two in the front and one in the rear passenger-side seat. The car turned into the alley behind the buildings and, about ten minutes later, B.B. saw the car come out of the driveway and turn right. About eight to ten minutes after that, B.B. heard seven to nine gunshots and yelling coming from the direction the white Toyota had driven.

E.G. and F.N. were nearby and they told her to call the police. B.B. called 911 and, as she spoke to the 911 operator, B.B. asked E.G. "the brand and the color" of the vehicle that had driven past earlier. B.B. described the vehicle to the 911 operator as a white Jetta with tinted windows. At trial, B.B. could not clearly remember whether the car was a Toyota, a (Volkswagen) Jetta, or a Honda, but she remembered that it was a small white car.

### b. Victim testimony and police response

A.C. testified that he was best friends with C.P., Perez's younger brother. A.C. had several tattoos, and when he was a juvenile, he associated with both Norteños and Sureños, depending on where he was living at the time. A.C. did not believe either Perez or C.P. identified as Norteño or Sureño, but after Perez was killed A.C. saw photos showing Perez with a tattoo of four dots on his elbow.

On October 17, 2011, A.C. was hanging out with C.P. and gave him a ride to C.P.'s apartment on Ross Circle.[8] A.C. parked his mother's blue Nissan in front of C.P.'s apartment where they continued to hang out and talk.

As A.C. and C.P. were talking, J.I. approached them and asked A.C. to play some music on his car stereo. J.I. said that he had a subwoofer at his apartment on the other side of Ross Circle, so the three men drove to J.I.'s apartment. J.I. rode on the hood of

---

[8] C.P., who was 17 years old at the time of the murder, testified that he lived at the apartment with his parents, his sister, and Perez, who was 18 years old.

A.C.'s car. After J.I. retrieved the subwoofer, they drove back and parked in front of C.P.'s apartment again.

A.C. started installing the speaker and Perez came outside, as did another neighbor, R.A. Perez was wearing C.P.'s red Washington Nationals baseball cap and listening to an iPod with earbuds.[9] A.C. testified that J.I., R.A., and Perez stood near the rear of the car talking as he and C.P. worked on the stereo system.

C.P. testified that, as he sat in A.C.'s car working on the stereo, he saw a white car "with really dark windows" drive slowly around Ross Circle several times. Due to the tinting of the windows, C.P. could not see how many people were in the car. C.P. saw the white car park a few car lengths in front of A.C.'s car. Two men[10] got out of the car, one from the driver's side and one from the passenger side. Both men were wearing black hoodies, with their hoods up and their sleeves pulled down over their hands. The men looked as if they were trying to conceal something in their hands.

At trial, C.P. identified Gomez and codefendant Gonzalez as the two men who got out of the white car and walked toward them that night, one approaching on the sidewalk and one walking in the street. J.I. identified Hernandez Garcia and Gomez as the two men who approached A.C.'s car but J.I. could not remember who was walking on the street and who was walking on the sidewalk.

C.P., J.I., and R.A. testified that the person who approached them on the street asked if they "banged." C.P., J.I., and R.A. all replied, " 'no,' " but Perez, who was wearing his earbuds, said, " 'What?' " Both men immediately started shooting.

---

[9] Perez had four dots tattooed on his left elbow and a Mongolian haircut, with his head shaved except for a "cluster of hair on the back of his head." The prosecution's gang expert testified that Norteños associated with the numbers four and 14 and, in 2011, commonly had Mongolian haircuts. C.P. also testified that Perez hung out with Norteños.

[10] J.I. testified that he saw three men get out of the vehicle but only two of them approached A.C.'s car.

C.P. looked toward the rear of A.C.'s car and saw "sparks" coming from the sleeves of the two men,[11] aimed at Perez. R.A. testified that he saw something "glossy," which he thought was a gun, in the waistband of the person on the sidewalk. Based on the "harsh" tone of the question about banging and "how fast" the person was walking, R.A. started running and then heard six gunshots. C.P., J.I., and A.C. all heard multiple gunshots and both J.I. and A.C. heard two different kinds of gunshots.[12]

A.C. and J.I. testified that the two shooters ran off. C.P. testified that he saw the shooters walk away and get back in the white car, which then drove out of Ross Circle.

A.C. heard Perez say he had been shot. A.C. turned and saw Perez moving toward his apartment, with blood on his shirt. Perez sat down on the sidewalk, then lay down. A.C. called 911. Perez was transported to the hospital but did not survive.

San Jose Police Officer Patrick Kirby responded to a report of a shooting on Ross Circle around 11:30 p.m. on October 17, 2011. Perez had been transported to the hospital before Kirby arrived, but Kirby saw medical intervention debris on the street near A.C.'s blue Nissan. Police recovered ten .22-caliber shell casings, one nine-millimeter shell casing, and two spent .22-caliber projectiles at the scene. When Kirby searched the Nissan, he found no stereo equipment or an iPod in the vehicle but did find a red Washington Nationals baseball cap on the rear passenger seat.

---

[11] A.C. testified that he saw the person standing in the street pull out a gun and start shooting. J.I. said that he saw the person on the sidewalk shooting a black firearm but did not see the person on the street with a gun, although he "heard the shots [fired by that person]."

[12] C.P. testified that the two guns sounded the same.

Perez was shot ten times. Six of the bullets were recovered during the autopsy, whereas the other four entered and exited his body. Two of the gunshot wounds, one through Perez's aorta and one through multiple loops of bowel, were fatal.[13]

### c. Identification testimony

A.C. gave a statement to police officers at the station that evening and met with a sketch artist on November 9, 2011. A.C. told the sketch artist that the person he remembered best was five feet eleven inches tall, weighed 190 pounds, with a medium build, a light skin complexion, some facial hair, as well as some acne.

C.P. met with the police sketch artist on November 2, 2011. C.P. described the suspect he remembered best as having a heavy build, five feet nine inches in height, weighing 185 pounds, with a dark complexion, a buzz cut hairstyle, and some facial hair.

On April 26, 2012, A.C. viewed two different photo lineups, one of which included a photo of Gomez (Gomez lineup) and the other of which included a photo of Gonzalez (Gonzalez lineup). A.C. picked out two photos from the Gomez lineup, one of which was Gomez, as resembling one of the people involved in the shooting. A.C. did not select any photographs from the Gonzalez lineup.

### d. Hernandez Garcia's white Jetta

San Jose Police Sergeant Jaime Jimenez testified that, on February 6, 2012, he responded to a report of a homicide in the alley behind 635 Bolton Court. The victim in that murder was Ramon Ruano, also known as "Spooky," a member of Varrio Sur Town (VST). Jimenez interviewed witnesses, including Hernandez Garcia and Gomez, and Gomez told Jimenez that he lived at 635 Bolton Court. Jimenez reviewed photographs of the crime scene taken by other officers and saw a photo of a white four-door Volkswagen

---

[13] According to the forensic pathologist, the bullet that punctured Perez's aorta "resulted in catastrophic blood loss." The bullet that went through Perez's bowels would have required emergency surgery for him to possibly survive.

Jetta. The Jetta in the photograph did not have tinted windows. During his interview with police, Hernandez Garcia confirmed that he owned a white Jetta.[14]

Jimenez was not convinced that Gomez and Hernandez Garcia were giving him the full story of what happened in the February 6, 2012 homicide, so he placed them together in an interview room by themselves and recorded their conversation. Jimenez watched the pair on a monitor in another room and heard them speaking together quietly in Spanish.[15] Some parts of their conversation were inaudible, but Jimenez did hear Gomez "express some concern that [] Hernandez-Garcia [sic] had revealed to the police" that he owned the white Jetta. Because that vehicle was not involved in the February 6, 2012 homicide, Jimenez did not initially think this part of Gomez and Hernandez Garcia's conversation was significant in any way.

After Jimenez interviewed Ulysses Vasquez, a cooperating witness, on April 24, 2012, he went back and reviewed the recording of Gomez and Hernandez Garcia, recognizing that their conversation about the white Jetta was relevant to the Ross Circle shooting.

The video recording of Gomez and Hernandez Garcia's conversation in the police interview room was played for the jury, which was also provided a transcript of the recording with the original Spanish and the English translation. Jimenez described the contents of the video, stating that after Gomez asked Hernandez Garcia whether he told the police he had a car, Hernandez Garcia nodded " 'yes.' " Jimenez testified that Gomez then asked, " 'Why did you say that? Don't tell them that.' " In response, Hernandez Garcia gestured to his pants pocket and explained that the police had found the key on him. Gomez again told Hernandez Garcia that he should not have said that to the police.

---

[14] On April 27, 2012, police photographed the same white Jetta in front of Hernandez Garcia's home.

[15] Jimenez testified that he is a certified Spanish speaking officer for the San Jose Police Department.

11

Jimenez testified that, in his opinion, the English translation of Gomez's last statement on the transcript of the recording is incorrect, and that Gomez actually told Hernandez Garcia that he should have bought a different car and disposed of the other one, i.e., the white Jetta.

### e. Cooperating witness Vasquez's testimony

Vasquez was called to testify as part of a plea deal in which he agreed to provide truthful testimony about the Ross Circle shooting in exchange for pleading guilty to various drug charges, including drug sales, vehicle theft, buying and receiving stolen property, and possession of a switchblade in exchange for a sentence not to exceed four years and eight months in county jail. Vasquez also signed a plea agreement on federal drug charges in which he agreed to plead guilty to those charges, cooperate with the Federal Bureau of Investigation (FBI), as well as testify against VST members about other offenses.[16] Vasquez was subsequently sentenced to 46 months in federal prison.[17]

Vasquez admitted that he had been convicted in 2008 on a charge of possession of burglary tools with the intent to break into vehicles. On November 1, 2012, Vasquez was arrested for felony car theft, receiving stolen property, and possession of methamphetamine, but was released at the scene.

Vasquez testified that he was Gomez's cousin and that Gomez went by the nickname "Tuffy." Vasquez also knew Gonzalez and Hernandez Garcia. Vasquez joined VST, a Sureño gang in 2007 or 2008 and was a member until 2013, as were Gomez and

---

[16] Vasquez testified that he gave information to former San Jose Police Detective Jesse Ashe about an unsolved attempted murder of a VST dropout. Detective Ashe confirmed that the person Vasquez identified as the perpetrator subsequently admitted shooting the VST dropout.

[17] Vasquez admitted on cross-examination that the federal charges against him had a mandatory minimum sentence of 10 years and a maximum sentence of life.

Gonzalez.[18]  However, Hernandez Garcia was not a VST member at the time Vasquez was.  Vasquez provided information to the FBI about VST, and in his interview, admitted to crimes he had committed while he was a member of the gang, including an incident in which he stabbed someone he suspected of belonging to a Norteño gang.[19]

On April 24, 2012, at around 1:05 a.m., Vasquez was parked in his car with his girlfriend on Impala Drive when he was detained by a police officer.  Vasquez had put a knife and methamphetamine in his girlfriend's purse because he did not think police would search her, but they did.  Vasquez was worried that his girlfriend would get in trouble, so he told police that he had information about an unsolved murder he would share.  Although Vasquez was on probation at the time of his arrest on April 24, 2012, he was able to post bail and was released from custody that same day.  Vasquez was arrested again on May 3, 2012, for being under the influence of methamphetamine and remained in custody on a probation hold.  On May 8, 2012, Sergeant Steven Bustillos had Vasquez transported from county jail and brought to the police department for an interview about the shooting on Ross Circle.[20]

In that interview, Vasquez informed Bustillos that Hernandez Garcia and Gonzalez had told him they were involved in the October 17, 2011 homicide on Ross Circle.  At trial, Vasquez admitted that he "lied a little bit" to Bustillos by not telling him

---

[18] At the time of trial, Vasquez had dropped out of VST and was in protective custody at the Santa Clara County jail.

[19] Prior to trial, Vasquez had served a federal prison sentence of 46 months for distribution of methamphetamine.  In addition to selling methamphetamine, Vasquez was using the drug every day in 2011 and 2012.

[20] Vasquez testified that, when police searched his house on June 27, 2012, they recovered "quite a bit" of stolen property, a Smith and Wesson firearm, two magazines, and ammunition.  Police recovered a shaved key which Vasquez admitted was used to steal automobiles.  Vasquez also admitted stealing cars and fencing stolen property but denied committing residential burglaries.  Vasquez was not charged with any crimes based on the stolen property discovered at his house.

13

that Gomez was involved in the murder and was the person who had, in fact, told him about the homicide.  Vasquez testified that Gomez admitted that he, Hernandez Garcia, and Gonzalez planned the homicide, driving around the area beforehand to scout entrances and exits as well as where possible rival gang members would "hang[] around." The plan was for Hernandez Garcia to drive to Ross Circle and wait in his car, which Vasquez knew was a white Jetta with tinted windows, while Gomez and Gonzalez approached the victim(s) on foot.  After Gomez and Gonzalez committed the shooting, they would run back to Hernandez Garcia's car and drive off.[21]

Vasquez testified that he was angry when Gomez told him about being involved in the Ross Circle homicide because Gomez knew Vasquez "had problems with the people in that area" and wanted to retaliate against them.  However, whenever Vasquez had told Gomez about his desire to go after people on Ross Circle, Gomez would always respond that they "weren't real northerners" and it was not worth going after them.  Gomez did not tell Vasquez why they picked Ross Circle or why they did not include him in the shooting.

Gomez described the actual shooting to Vasquez, stating that after he and Gonzalez got out of Hernandez Garcia's car, they walked up to a group of people who were "[j]ust standing around" on Ross Circle and started shooting.  Gomez said that he had a nine-millimeter firearm and Gonzalez had a ".25 [caliber]" Smith and Wesson with a gold trigger and they both fired until they ran out of bullets.  Gomez told Vasquez he got angry at Hernandez Garcia as they fled the scene because the plan was for him to not stop for red lights, but Hernandez Garcia stopped at a light before they entered the freeway.

---

[21] Vasquez explained that VST had a rule against drive-by shootings because of the risk to bystanders.  According to Vasquez, violating that rule would result in discipline from the gang.

14

Vasquez had previously seen Gomez with two nine-millimeter firearms and the .25-caliber Smith and Wesson. Gomez had obtained these guns before the murder from Vasquez's cousin, J.P. J.P. told Vasquez that he got the guns from a burglary he committed. The nine-millimeter guns were in gun cases, but Vasquez could not remember if the .25-caliber had a gun case. The serial numbers on the weapons had been removed. Vasquez asked Gomez to sell him one of the guns, but Gomez refused, saying that Vasquez had a "temper and . . . would do something stupid if [he] had one."

Gomez told Vasquez that, after the homicide, he and Hernandez Garcia "started changing the car up a little bit," and "first thing that came off was the [window] tint." Gomez also said that he gave Hernandez Garcia money so he could get rid of the white Jetta and purchase a different car so there would be no evidence linking him to the Ross Circle homicide. Vasquez testified that Hernandez Garcia did eventually sell his white Jetta when he started having problems with its transmission. After the Ross Circle shooting, whenever Vasquez spoke to Hernandez Garcia about it, Hernandez Garcia "acted like he didn't know that area."

Sometime between March and April 2012, Hernandez Garcia asked Vasquez for a gun. Hernandez Garcia lived in an area claimed by Norteños and he told Vasquez he needed a gun for protection. Vasquez sold him a gun and, when Hernandez Garcia was arrested in this case, he had the gun that Vasquez sold to him in his pocket.

Vasquez testified that Gomez contacted him a couple of days after the Ross Circle shooting and asked for a ride to Santa Cruz so that Gomez could dispose of the guns. Vasquez agreed, saying he would take Gomez after work around 4:00 p.m. However, Gomez instead got a ride with Vasquez's brother, R.V. Vasquez was angry that Gomez had involved his brother in getting rid of weapons used in a homicide since that might put his brother's life at risk if he was subpoenaed to testify. Vasquez later told police about his brother's involvement in disposing of the guns, but when Vasquez thought police

15

might charge his brother as an accessory to the Ross Circle murder, Vasquez told his brother to not cooperate with police.

Sometime after Vasquez posted bail on April 24, 2012, he and Gomez went to the Santa Cruz mountains to shoot guns with B.P. (also known as Caspar) and R.P. (also known as Rascal).[22] Vasquez said that one of the guns they fired that day was the Sig Sauer nine-millimeter that J.P. had stolen. At some point that day, Vasquez asked R.P. what happened to the guns Gomez and R.V. had brought a couple days after the Ross Circle shooting. R.P. said they had hiked some ways into the mountains and buried them, but he would not be able to find them again.

Vasquez testified that he went to Gomez's house on February 6, 2012, the day that Ramon Ruano was killed and that Ruano, Gomez, Gonzalez, Hernandez Garcia, and Caspar were there as well. After Ruano was killed, Vasquez, Gomez, Gonzalez, and Caspar had some generalized discussion about retaliating but when Vasquez began having more serious conversations about retaliation, it was only himself, Gonzalez, and Gomez. Other VST gang members were pressuring Gomez to retaliate because Ruano was killed while attending the Super Bowl party at Gomez's house. Gomez did not want Hernandez Garcia involved in any retaliation because he had talked to police in their investigation into Ruano's homicide and he stopped at a red light after the Ross Circle murder.[23]

---

[22] Vasquez testified that Caspar and Rascal were members of VST and knew both Gomez and Gonzalez.

[23] After the Ruano murder, Vasquez said that Hernandez Garcia told him that he wanted to get jumped into VST. Vasquez knew that Gomez was angry at Hernandez Garcia for giving information to the police in the Ruano murder and so Vasquez told Hernandez Garcia that VST was "not going to want to jump" him into the gang.

### f. Vasquez's whereabouts on October 17, 2011

Vasquez testified that he was home alone on October 17, 2011, when he saw a social media post from his cousin, E.S., who lived on Ross Circle, about the shooting.[24] It was around 10:00 p.m. when E.S. posted that he heard what he thought were gunshots. Vasquez replied to the post, making fun of his cousin for "acting [] really scared."

On cross-examination, Vasquez testified that, during the trial, Jimenez asked him why Vasquez's cell phone data indicated he was in the area of Ross Circle on the evening of October 17, 2011. Vasquez did not remember where he was but admitted he could have driven "near Ross Circle" that night. Vasquez knew several people, including his girlfriend, who lived on Ross Circle or nearby.

### g. Defendants' arrests, property searches, and recorded conversation

Based on his April 24, 2012 interview with Vasquez, Jimenez prepared search warrants for Gomez's and Hernandez Garcia's homes, vehicles, and cell phones. On July 13, 2012, police arrested Gomez and Hernandez Garcia and conducted searches pursuant to the warrants.

In Hernandez Garcia's apartment, police found several pair of boxing gloves with gang markings written on them, as well as a black ski mask. When police searched Hernandez Garcia, he had a firearm in his pocket. Hernandez Garcia told police he had the weapon for self-defense but admitted it was not registered to him. He also said that it was not a weapon that belonged to the gang. When police asked Hernandez Garcia about his white Jetta, he said that he was driving a different car now and had sold the Jetta.

---

[24] Vasquez testified that, although he was "pretty certain" he was home when he saw this post, he "could have been" at L.A.'s house instead.

17

At Gomez's residence,[25] police found gang paraphernalia, including articles of clothing, and photos in which Gomez was wearing gang clothing and making gang signs. Police searched a tan Chrysler associated with Gomez and, on the floor behind the driver's seat, found a loaded nine-millimeter Sig Sauer semiautomatic handgun in a plastic gun case.[26] Police also found a box of spent nine-millimeter shell casings in the vehicle.

Following their arrest, Gomez and Hernandez Garcia were put together in a patrol car equipped with recording equipment. In the recorded conversation, Gomez asked Hernandez Garcia whether the police seized any of his vehicles. Hernandez Garcia responded that they had taken the car he was driving that day, his black Honda. When Gomez asked if Hernandez Garcia had said anything to the police, Hernandez Garcia said he had not.

### h. Firearms testimony

### i. Burglary and theft of firearms

On August 10, 2011, D.B. came home and discovered that his home had been burglarized while he was at work that day. When he entered the house, D.B. saw that it had been ransacked and that some of his personal property had been stolen, including a small safe. D.B. testified that the safe contained money and some jewelry, as well as three firearms and ammunition. Specifically, the firearms were a .22-caliber Browning

---

[25] Police searched two adjoining apartments and found evidence showing that Gomez occupied both apartments.

[26] D.B., whose home had been burglarized on August 10, 2011, (described in more detail, *post*, at section I.B.1.h.i.) identified the Sig Sauer and plastic case found in Gomez's car as one of the firearms stolen from home. D.B. testified that he knew the gun was his because the rear sight was a unique single vertical line and the grips were custom Brazilian rosewood that he shaped and installed himself. The serial number on the weapon had been ground off.

Buck Mark Plus,[27] a nine-millimeter Sig Sauer P226, and a nine-millimeter Beretta 92FS. D.B. immediately reported the burglary and theft of his firearms to the police. Sometime later, D.B. met with police officers and gave them some spent shell casings he had collected, prior to the burglary, for possible reloading after he used his Sig Sauer and Beretta handguns at a firing range.

Former San Jose Police Detective Jesse Ashe testified that, in 2012, while he was investigating the burglary of D.B.'s house, he interviewed several juveniles, including then-17-year-old, J.P. According to Ashe, J.P. admitted participating in the burglary and taking a safe from the house. J.P. initially denied taking any firearms but later told Ashe that he gave the weapons from the safe to "Tuffs." Ashe showed J.P. a photo of Gomez and J.P. said that the person in the photo was "Tuffs."

### ii. Expert firearms testimony

Brian Karp, a firearms examiner at the Santa Clara County District Attorney's Crime Laboratory, testified as an expert in firearms and ballistics. According to Karp, he analyzed the ten .22-caliber shell casings recovered from the Ross Circle shooting and concluded all those casings were fired from the same firearm. Karp examined the weapon that was found on Hernandez Garcia's person when he was arrested and determined that it was not the gun that fired the casings collected at Ross Circle.

Karp next examined the nine-millimeter shell casing found at Ross Circle and matched it to two of the spent nine-millimeter casings that D.B. provided to police in connection with their investigation into the theft of his guns. However, Karp also determined that the Sig Sauer pistol found in Gomez's car was not the nine-millimeter gun that fired the casing found at the scene of the shooting.

---

[27] D.B. testified this handgun had a gold trigger, which was "traditional[]" for this manufacturer.

Finally, Karp analyzed the eight spent projectiles that were recovered from Perez's body and from the scene of the shooting.[28]  Karp concluded that two of the bullets were fired by the same firearm.  Two other bullets also were likely fired from a second firearm. The remaining bullets "had some agreement" in their characteristics, but not enough for Karp to make any conclusions about their origin.

### i. R.P. and P.P.'s testimony

R.P. testified that, at the time of the homicide, he lived with his father, P.P., and his brother B.P., in a rural town in the Santa Cruz mountains.  R.P. denied that he had ever used the name "Rascal," nor did anyone call him that.  R.P. also denied hearing anyone refer to his brother, B.P., as "Casper."

R.P. said that he had known Gomez since middle school but did not know Hernandez Garcia or Gonzalez nor did he know Vasquez or R.V.  Gomez had never been to R.P.'s home in the Santa Cruz mountains.  R.P. testified that he had heard of VST and Sureños but knew nothing about either of those groups.  R.P. did not identify with VST and did not know anyone who identified as VST or Sureños, including his brother, B.P. R.P. was shown a photograph in which he was depicted with Gomez and a third person using their hands to spell out VST, but he testified that he did not remember why he did so.  R.P. denied ever having a conversation with anyone about burying weapons that he got from Gomez on his family's property.

P.P. testified that, when his family was living in San Jose before they moved to the Santa Cruz mountains, he heard the other children in the neighborhood calling R.P. "Rascal" and B.P. "Casper."  R.P. and B.P. both spent time with Sureños when they were younger as did every other child in the neighborhood.  After they moved to the Santa Cruz mountains in 2008, some of R.P. and B.P.'s friends from their old neighborhood

---

[28] Karp testified that one of the eight projectiles did not have "any microscopic markings of value . . . to do a comparison examination."

would visit. P.P. recognized Gomez's name as one of his sons' friends and believed they called him "Tuffy." P.P. did not know about his sons or their friends doing any target shooting at his property and he would not allow them to do so, given that the property was next to a road.

### j. L.A.'s testimony

L.A. testified that he is Vasquez's best friend, but he personally had no ties to VST or the Sureños.[29] In October 2011, L.A. lived at an address on Almaden Expressway, and before Vasquez was arrested, L.A. would see him nearly every day, either at his house or at Vasquez's house.

L.A. was with Vasquez when they saw a Facebook post from Vasquez's cousin, E.S., about a shooting on Ross Circle. According to L.A., Vasquez had been at his house for an hour and a half prior to them seeing that social media post about the shooting. L.A. and Vasquez responded to E.S.'s post within a few minutes, teasing him and telling him it could have been fireworks. L.A. has never owned a car himself, but in 2011, L.A.'s parents had a "[d]ark blue[], navy blue" 2000 Volkswagen Jetta that he would sometimes drive.

### k. Cell phone evidence

Marshall Norton, with the district attorney's bureau of investigations, testified as an expert in cell phone analysis and analyzing call detail records. Norton analyzed Vasquez's and R.V.'s call detail records, initially for October 17, 2011 and October 18, 2011, with reference to their home address, the address of the shooting on Ross Circle, and an address near Almaden Expressway where Vasquez's friend, L.A., lived.[30] Norton

___

[29] L.A. admitted that, on June 10, 2010, he was convicted of annoying or molesting a minor.

[30] L.A.'s home was about two miles from Ross Circle. Vasquez and R.V.'s home was a little over two miles from Ross Circle. Norton testified that these three addresses "are relatively close to each other, within . . . roughly just shy of a four-mile area line of sight between each other."

21

testified that, between 5:38 p.m. and 5:43 p.m. on October 17, 2011, Vasquez's phone contacted a cell phone tower approximately 1000 feet south of Ross Circle. At 5:46 p.m., Vasquez's phone connected to a tower east of Ross Circle and then, at 7:38 p.m., it again connected to the tower south of Ross Circle. At 7:48 p.m., Vasquez's phone connected to the tower near L.A.'s home on Almaden Expressway, approximately one mile from the tower near Ross Circle. At 8:34 p.m., 8:35 p.m., and 8:37 p.m., Vasquez's phone connected to the Almaden Expressway tower. Then, at 8:39 p.m., Vasquez's phone accessed the internet and, in doing so, utilized the tower closest to Ross Circle.[31] Between 8:40 p.m. and 8:59 p.m., Vasquez's phone did not connect to any cell phone towers. At 9:02 p.m., Vasquez's phone sent a text message and received a text message at 9:04 p.m., but Norton testified no cell tower information was identified for those communications.

Based on the pattern of cell tower connections, Norton opined it was possible Vasquez's phone was at Ross Circle at 8:57 p.m., but it was more likely the phone was located between the Ross Circle tower and the Almaden Expressway tower. Based on the data Norton reviewed for the period from October 16, 2011 and May of 2012, Vasquez's phone was frequently located in the area of Ross Circle and Almaden Expressway.

Norton testified that, on October 17, 2011, R.V.'s phone did not connect to the tower closest to Ross Circle at any time that day. Between 8:15 p.m. and 9:15 p.m. on that day, R.V.'s phone was connecting to a cell tower near his home address.

The following day, R.V.'s phone connected to cell towers near Gomez's residence around 5:00 p.m. then later connected to towers along Highway 17 indicating movement toward Santa Cruz. Between 8:46 p.m. and 9:47 p.m., R.V.'s phone connected to towers in Boulder Creek in the Santa Cruz Mountains. Beginning around 10:00 p.m., R.V.'s

---

[31] Norton testified that, in October 2011, not all cell towers would support internet access so when a user tried to use the internet, their phone would search for the closest tower that provided that service.

phone connected to towers indicating movement toward San Jose and, at 11:38 p.m., the phone connected to the tower near Gomez's residence.

Jimenez testified that, although police were able to obtain cell phone data for Gomez, Hernandez Garcia, and Gonzalez, the records for their phones only went back to December 2011.

### l. General gang evidence and opinion re: shooting

Former San Jose Police Detective Ashe testified as an expert on criminal street gangs. Ashe was assigned as the gang detective in the Perez killing and testified that his duties included determining whether a crime he was investigating was a gang-related offense. Ashe testified that VST has over 100 members and is the most significant Sureño criminal street gang in San Jose.

According to Ashe, VST members associate with various signs and symbols, including the numbers three, 13, and 408; the letter "M"; the words "West Side," "East Side," "Malos," "Intruders," and "Cadillac"; certain sports teams, such as the Dallas Cowboys and the San Jose Sharks; and the colors blue and black. Ashe testified that VST gang members will use hand signs or use parts of their body to spell out the letters "V-S-T" and the letter "W." VST's primary activities include murder, attempted murder, narcotic sales, vehicle theft, vandalism, and assault with a deadly weapon.

VST and Sureño gangs are rivals with Norteño gangs. Norteño gang members associate with the numbers four and 14; the letter "N"; the color red; and both the San Jose Sharks and the Washington Nationals sports teams. Between 2006 and 2013, Ashe testified that Norteño gang members would adopt a Mongolian hairstyle, with the sides cropped short and a long braid in the back. According to Ashe, up to 2013, Sureño gang members would have never styled their hair that way, but within the six months prior to the trial, he had seen Sureño gang members with that haircut.

Ashe said there were "many" "VST stronghold[s] in San Jose," but "generally that whole west side, . . . is claimed by VST." When asked if Ross Circle was claimed by any

23

particular gang, Ashe stated that, in his opinion, it was not although "it is more towards the west side of San Jose." When a gang member asks a person if they " 'bang,' " they are doing so to find out if that person is a rival gang member. In Ashe's experience, the answer given is almost always irrelevant and the person is usually assaulted no matter how they respond.

Ashe testified that each of the defendants had gang-related tattoos on various parts of their bodies that indicated their affiliation with Sureños and VST. In Ashe's opinion, Hernandez Garcia, Gomez, and Gonzalez were active members of VST.

Given a hypothetical mirroring the facts of the case, Ashe opined that the shooting on Ross Circle was committed for the benefit of, at the direction of, and in association with a criminal street gang, specifically VST. Ashe testified that the shooting enhanced the status and reputation of VST, made witnesses more reluctant to report on or testify about the gang's illegal activities, and made it less likely that rival gangs would enter their territory or assault Sureño or VST gang members.

### m. Gang predicate offenses

J.J. testified that, on January 22, 2009, he was contacted by R.A. who wanted to buy a pit bull puppy from J.J. J.J. was inside his house waiting for R.A. to arrive when he heard someone screaming for help outside. J.J. opened his door and saw three men attacking R.A. The men were asking R.A. what gang he was in and why he was in the neighborhood.[32] J.J. walked outside and told the men that R.A. was not in a gang and the men backed away. J.J. had heard of VST but they were always "respectable" toward him.

---

[32] A few days later, R.A. told police that he was in J.J.'s front yard when he was confronted by several men, who told him he was in a "VST 13 . . . area." One of the men pulled out what looked like a "putty knife with [] a hook end or sharpened end and attempted to slash him with it."

24

On January 25, 2009, J.J. was driving in his neighborhood when he saw one of the men who had attacked R.A. three days prior. J.J. said the man made a gang hand sign at him and threw a rock at his car. J.J. stopped his car and the man came over to the passenger side window, which was open. When J.J. asked the man what he was doing, the man did not respond but tried to stick him with a long metal rod sharpened on one end. J.J. drove away and, when he got home, called the police. J.J. met a police officer at the spot where the man tried to stab him, but the man was no longer there. When J.J. drove back to his house, the man was at his front door. A police officer was already behind J.J.'s residence and he chased after the man.

Robert Paul, who was employed by the San Jose Police Department in 2009, testified that he responded to J.J.'s report, then pursued and apprehended Juan Elisea for that offense. Elisea had Sureño tattoos and Ashe opined that he was a VST member at the time of the two assaults. Elisea eventually pleaded guilty to two counts of assault with a deadly weapon, admitted the associated gang enhancement allegations, and further pleaded guilty to one count of resisting a peace officer.

M.E. testified that, on August 5, 2010, he was with his girlfriend, T.C., and T.C.'s four-year-old niece, in the swimming pool area at their apartment complex. A group of four or five young men ran towards them and one of them asked for help hiding from police. M.E. did not agree to help them, and the men started stabbing him in the neck, stomach, and the back of his head.[33] When shown a photographic lineup after the assault, M.E. identified Sergio Garcia as one of the men who attacked him. On October 31, 2011, Garcia pleaded guilty to charges of attempted murder and assault with a deadly weapon and admitted weapon and gang enhancements. Based on a hypothetical

---

[33] M.E. testified that he received 178 stitches for his wounds, his "stomach had to be operated on from the inside out," and he believed he "died twice on the [operating] table."

summarizing the facts of this offense, Ashe opined Garcia was a member of VST at the time of the assault.

In 2008, F.A., since retired, was a member of the San Jose Police Department. On February 13, 2008, F.A. responded to Valley Medical Center and met with 15-year-old J.F. J.F. had two stab wounds on his lower back and hip. J.F. reported that he was with two friends when two people, one of whom he identified as Gomez, walked up to them. Gomez's hands were in his pockets, and he asked J.F., "[D]o you bang?" When J.F. said, "[N]o," Gomez replied, " 'This is VST.' " J.F. turned and walked away but felt a sharp pain in his back. J.F. ran to a nearby residence and asked the occupants to call 911.

### 2. Defense case[34]

#### a. Gonzalez's witnesses

Gonzalez called Dr. Geoffrey Loftus as an expert on human perception and memory. Dr. Loftus explained that not all information about an event that is received by a person's brain is stored as memory because the volume of information is simply too great. Consequently, witnesses often "incorporate post-event information into their memory . . . to fill the gaps and [] create a more coherent and organized story of what actually happened." There is no way to know whether this post-event information is accurate, however. This phenomenon can result in a witness misidentifying a suspect as the person they saw committing a crime, and that misidentification may only be discovered when the suspect is exonerated based on DNA evidence, for example.

Dr. Loftus also testified that lighting conditions can affect the quality of a person's memory as low illumination reduces the amount of detail that humans can perceive. In situations involving weapons, people exhibit a phenomenon "called 'weapons focus,' " in which "the witness's attention [is] focused on the weapon" rather than other things, such as the appearance of the person holding the weapon.

---

[34] Gomez's counsel called no witnesses on his behalf.

In response to a hypothetical tracking the facts of the Ross Circle shooting, Dr. Loftus opined that the witnesses at the scene would not necessarily have paid close attention to the men who exited the car and approached them on the street. Once the men pulled out weapons, the witnesses' attention would become focused on escape or getting help, as well as on the weapons that are now displayed.

Dr. Loftus testified that where police seek to have a witness identify someone as the perpetrator, a photo lineup or an in person lineup are more reliable than a show-up procedure. In a show-up procedure, where the witness is shown one suspect, the witness's identification may be based on other factors such as social pressure to make a positive identification or a motivation to see someone prosecuted for the crime. Dr. Loftus testified that an in-court identification is essentially the same as a show-up procedure.

Gonzalez also called James Norris as an expert in firearms and ballistics. Norris testified that toolmark identification of shell casings and bullets is not scientifically reliable because the marks created by a particular gun when it fires can change over time. In Norris's opinion, one could not definitively conclude that the nine-millimeter shell casing recovered at the Ross Circle shooting had been fired from the same gun as the spent nine-millimeter shell casings provided by D.B.

### b. Hernandez Garcia's witnesses

Hernandez Garcia's older sister, J.H., testified that she purchased a white Jetta for her brother sometime before October 2011. The car did not have tinted windows because, according to J.H., dark windows "draw [police] attention" which is "something [she] wanted to avoid." Hernandez Garcia drove the car for about three years, but then it was sold because it had mechanical problems. She subsequently purchased a black Honda for her brother.

Other members of Hernandez Garcia's family testified that his Jetta did not have tinted windows. Hernandez Garcia's brother, P.H., testified that the boxing gloves and

black ski mask police took from their residence belonged to him. P.H. testified that when he purchased the boxing gloves, they did not have gang markings on them and he did not make those marks. He did not know who made the gang markings but first noticed them five or six months after he bought them.

M.M. testified that he was living in a second-floor apartment on Ross Circle on the date of the shooting. When he heard gunshots, M.M. ran to the window and saw a dark "Toyota, a four-cylinder-type little car taking off." M.M. also saw three people wearing dark sweatshirts with their hoods up running across the park area on Ross Circle.

Anna-Marie Klimkova Trajtemberg is a certified Spanish interpreter employed by the Santa Clara County Superior Court. Trajtemberg testified that she listened to and watched the February 6, 2012, video recording of the conversation between Gomez and Hernandez Garcia and created her own translation of that conversation.[35] In a portion of the conversation, Gomez asked Hernandez Garcia if he had told the police he had a car. In response, Hernandez Garcia nodded his head and then said, " 'Well, the thing is they found the key on me, dude.' " Gomez then told Hernandez Garcia, " 'Well, but don't tell them anything about that,' " followed by, " 'you should not have said that.' " Hernandez Garcia replied, " 'To get out of the car . . .' " followed by some words that were inaudible or unintelligible, concluding with " 'here.' " Trajtemberg testified that parts of the conversation were not intelligible, but she did not hear either Gomez or Hernandez Garcia say anything about buying or selling a car, specifically stating that she did not hear the words "desecho" or "comprar" in the recording.

---

[35] Trajtemberg's transcription was admitted into evidence as Defense Exhibit CCC.

## II.     DISCUSSION

### A. Hernandez Garcia's murder conviction

Hernandez Garcia initially argued that his conviction for first degree premeditated murder must be reversed because it is likely the jury convicted him under an invalid theory of the crime, specifically that malice was imputed to him based on participation in the crime. We do not reach this argument. Based on the supplemental briefing our court requested, we conclude that due to the trial court's failure to instruct the jury on the meanings of "willfully," "deliberately," and "with premeditation," or with the instructions describing aider and abettor liability for murder, Hernandez Garcia's conviction for first degree murder requires reversal.

#### 1. Applicable legal principles

"We review a claim of instructional error de novo. [Citation.] 'Review of the adequacy of instructions is based on whether the trial court "fully and fairly instructed on the applicable law." ' [Citation.]" (*People v. Barber* (2020) 55 Cal.App.5th 787, 798 (*Barber*).) "Generally, the trial court is required to instruct the jury on the general principles of law that are closely and openly connected with the evidence and that are necessary to the jury's understanding of the case. [Citation.] It also has a duty to refrain from giving incorrect instructions or instructions on principles of law that are irrelevant and that would have the effect of confusing the jury or relieving it from making findings on the relevant issues." (*Id.* at p. 799.) The trial court's duty in this regard extends to lesser included offenses that " 'find substantial support in the evidence.' " (*People v. Thomas* (2023) 14 Cal.5th 327, 388–389 (*Thomas*), quoting *People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*).) "In determining the correctness of jury instructions, we consider the entire charge of the court, in light of the trial record. [Citation.]" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 926 (*Covarrubias*).)

"An erroneous failure to instruct on a lesser included offense requires reversal of a conviction if, taking into account the entire record, it appears ' "reasonably probable" '

29

the defendant would have obtained a more favorable outcome had the error not occurred. (*People v. Breverman* (1998) 19 Cal.4th 142, 178 [77 Cal. Rptr. 2d 870, 960 P.2d 1094]; see *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)" (*People v. Ledesma* (2006) 39 Cal.4th 641, 716.) In a noncapital case, a failure to instruct sua sponte on a lesser necessarily included offense that is supported by the evidence is state law error that we review for prejudice under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*Breverman*, *supra*, 19 Cal.4th at p. 169.) " '[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 955.) "We also consider the instructions as a whole, the jury's findings, and the closing arguments of counsel." (*People v. Larsen* (2012) 205 Cal.App.4th 810, 831.)

### 2. Additional background

Before the parties gave their closing arguments, the trial court instructed the jury, pursuant to CALCRIM No. 520, on the elements of murder. The trial court did not instruct the jury on the elements of premeditation or deliberation as set forth in CALCRIM No. 521, which would have also instructed the jury that if the People failed to prove beyond a reasonable doubt that defendants acted with premeditation or deliberation, "the murder is second degree murder."[36]

During closing argument, the prosecutor argued that the jury should find Hernandez Garcia guilty of first degree murder as an aider and abettor as he participated in the planning of the crime and drove Gomez and Gonzalez to and from the scene. The prosecutor also argued that Hernandez Garcia was not one of the shooters but was equally guilty of first degree premeditated murder as the driver. The jury ultimately convicted Hernandez Garcia of first degree murder and, on the verdict form, found true the

---

[36] The trial court did instruct the jury on premeditation and deliberation as to the attempted murder charges, counts 2 through 5. The jury acquitted defendants of those charges.

allegation that he "willfully, deliberately and with premeditation murderd [*sic*] Hanzel Perez."

### a. Supplemental briefing

### i. Hernandez Garcia's arguments

In his supplemental brief, Hernandez Garcia argues that his conviction for first degree murder is invalid because the court failed to instruct the jury on the elements of "willful," "deliberate," and "with premeditation" in connection with count 1. He acknowledges that the trial court did instruct the jury on these elements in connection with the charges of attempted murder (counts 2, 3, 4, and 5) but explains that "[j]urors are not attorneys and do not understand the intricacies of the law."

Hernandez Garcia also argues that his first degree murder conviction must be reversed due to the trial court's failure to instruct the jury on the elements of aiding and abetting liability as set forth in CALCRIM Nos. 400 and 401. To be guilty of first degree murder as an aider and abettor, the jury must be instructed "that a person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561 (*Beeman*).) Hernandez Garcia notes that the trial court instructed the jury on *accomplice* liability with CALCRIM No. 3150, but this instruction was incomplete as it does not require the jury to find Hernandez Garcia "acted with the intent or purpose of committing, encouraging, or facilitating the first-degree murder and by act or advice aided, promoted, encouraged, or instigated, the commission of the murder."

### ii. Attorney General's arguments

The Attorney General concedes that the trial court failed to instruct the jury with CALCRIM No. 521 on the meanings of "willful," "deliberate," and "with premeditation" on the charge of first degree murder but argues that the jury was provided those

31

definitions in CALCRIM No. 601 and further instructed the jury that it should "consider [all of the instructions] together." In the alternative, the Attorney General argues that the failure to instruct the jury with CALCRIM No. 521 was not error because "willful, deliberate, and premeditated are not legal terms of art."

The Attorney General next contends that any error was harmless beyond a reasonable doubt, because the evidence showed that Hernandez Garcia not only drove the getaway vehicle but participated in planning the shooting.

With respect to the failure to instruct on aiding and abetting liability, the Attorney General claims that the court's instruction on the firearm-use allegation (CALCRIM No. 3150) was sufficient to apprise the jury of what it needed to find to convict Hernandez Garcia as an aider and abettor. Specifically, CALCRIM No. 3150's language regarding accomplice liability was sufficient to advise the jury that it had to find that Hernandez Garcia knew that Gomez and Gonzalez intended to kill, that he shared that intent, and that he assisted them in committing the murder.

In the alternative, the Attorney General argues that the failure to instruct the jury on aiding and abetting was harmless. Because there is no reasonable likelihood the jury believed it could convict Hernandez Garcia, as the getaway driver, of murder without him knowing and sharing in his codefendants' intent to commit murder. The evidence showed that Hernandez Garcia knew of and participated in the plan to commit murder.

### 3. Analysis

Murder "is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) Malice "may be express or implied." (§ 188, subd. (a).) " 'It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature.' " (*People v. Swain* (1996) 12 Cal.4th 593, 600 (*Swain*).) "*Implied malice* murder, in contrast to express malice, requires instead an intent to do some act, the natural consequences of which are dangerous to human life." (*Id.* at p. 602.) Section 189 provides in pertinent part that, "(a) All murder that is perpetrated . . . by any [] kind of

willful, deliberate, and premeditated killing . . . is murder of the first degree. [¶] (b) All other kinds of murders are of the second degree." It is well-settled that "the prosecution is required to prove not only the elements of murder, but also the aggravating elements of first degree murder. [Citation.]" (*People v. Steger* (1976) 16 Cal.3d 539, 545 (*Steger*).)

"A person who kills unlawfully with implied malice is guilty of second degree murder." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.) " ' "Second degree murder is the unlawful killing of a human being with malice, but without the additional elements . . . that would support a conviction of first degree murder." ' [Citation.]" (*People v. Banks* (2014) 59 Cal.4th 1113, 1160 (*Banks*), disapproved on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3.) "Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).)

### a. Failure to instruct on premeditation and deliberation

CALCRIM No. 521 states, in pertinent part: "The defendant is guilty of first degree murder if the People have proved that (he/she) acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if (he/she) intended to kill. The defendant acted *deliberately* if (he/she) carefully weighed the considerations for and against (his/her) choice and, knowing the consequences, decided to kill. The defendant *acted with premeditation* if (he/she) decided to kill before completing the act[s] that caused death. [¶] . . . [¶] The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder and the murder is second degree murder."

In this case, the prosecution argued that Gomez, Gonzalez, and Hernandez Garcia were guilty of express malice first degree murder. The prosecution acknowledged Hernandez Garcia was the driver, not one of the shooters, but argued he was equally guilty as the other two defendants as an aider and abettor because he "is driving the

33

defendants to the place where they're going to commit the crime and he's acting as the getaway driver immediately after."

As to count 1, the trial court instructed the jury on the elements of murder, but not the aggravating elements of first degree murder or that the failure to prove those elements reduced the murder to second degree. (*Steger*, *supra*, 16 Cal.3d at p. 545 [People must prove aggravating elements of first degree murder]; *Banks*, *supra*, 59 Cal.4th at p. 1160 [trial court must instruct jury sua sponte on second degree murder as lesser included offense of first degree murder].) Accordingly, the trial court erred.

We evaluate the failure to instruct the jury on an element of an offense for prejudice under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 642; *Swain, supra*, 12 Cal.4th at p. 607.) Under this standard, we must reverse the conviction unless after examining the entire cause, including the evidence, and considering all relevant circumstances, it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman*, *supra*, at p. 24.)

We are not persuaded by the Attorney General's arguments for several reasons. First, the Attorney General's arguments fail to take into account the essential distinction that is drawn between first degree murder and second degree murder. For first degree premeditated murder, a jury must find that "the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.) Although we are to consider the jury instructions as a whole (*Covarrubias*, *supra*, 1 Cal.5th at p. 926), it is notable that the jury *acquitted* Hernandez Garcia (and the other defendants) on the charges of attempted murder after being instructed on premeditation and deliberation in connection with *those* counts.

Second, we do not find that the verdict form for count 1 that Hernandez Garcia "willfully, deliberately and with premeditation murderd [*sic*] Hanzel Perez" supports a

34

conclusion, beyond a reasonable doubt, that the failure to instruct on the aggravating elements was harmless. The murder and the attempted murders all arose out of the same events and yet the jury acquitted Hernandez Garcia on all counts of attempted murder. The evidence presented at trial relating to Hernandez Garcia's participation was that, at least a day before the shooting, he drove his codefendants to Ross Circle and scouted the area, drove them to the scene to carry out the shooting, and then acted as the getaway driver. No one testified that Hernandez Garcia was one of the shooters and the prosecution never argued he was or might have been; instead, the prosecution's theory of liability for Hernandez Garcia was that he was equally guilty as the perpetrators as an aider and abettor. "Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).)

Third, we find it significant that the jury was *not* instructed that, if the prosecution had failed to prove that Hernandez Garcia was guilty of first degree murder, it could find him guilty of second degree murder. (See *Banks*, *supra*, 59 Cal.4th at p. 1160 [error to not instruct jury sua sponte on second degree murder as lesser included offense of felony murder]; see, e.g., *People v. Campbell* (2015) 233 Cal.App.4th 148, 174 [reversing convictions where they "may have resulted from the 'all-or-nothing' choice the instructions gave the jury"].) As discussed above, the trial court is obligated to instruct the jury on lesser included offenses that " 'find substantial support in the evidence.' " (*Thomas*, *supra*, 14 Cal.5th at pp. 388–389, quoting *Breverman*, *supra*, 19 Cal.4th at p. 162.)

Given the state of the evidence and considering the jury was not specifically instructed that they were required to find Hernandez Garcia's actions were "willful," "deliberate," and taken "with premeditation" in connection with the charge of first degree murder, we cannot say beyond a reasonable doubt that the failure to instruct the jury on those aggravating elements and on the lesser included offense of second degree murder did not contribute to the jury's verdict on count 1. (*Chapman*, *supra*, 386 U.S. at p. 24.)

35

### b. Failure to instruct on aider and abettor liability

As confirmed by the Attorney General's supplemental briefing, the prosecution's "theory of the case was that [Hernandez Garcia] aided and abetted Gomez and Gonzalez in the willful, deliberate, and premeditated murder of Hansel Perez by driving them to and from the crime in his white Jetta." (Fn. omitted.) It is well recognized that trial courts are obligated to instruct sua sponte "on general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case." (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.) Accordingly, the trial court had a duty to instruct the jury on aider and abettor liability.[37]

We are not persuaded by the Attorney General's argument that the trial court's instruction on accomplice liability, given in connection with the firearm use allegation associated with count 1, was sufficient to inform the jury on aider and abettor liability. That instruction stated, in pertinent part, as follows: "A person is an *accomplice* if he is subject to prosecution for the identical crime charged against the defendant. A person is subject to prosecution if he committed the crime or if: [¶] 1. He knew of the criminal

---

[37] The standard CALCRIM instructions on aider and abettor liability are CALCRIM No. 400 and CALCRIM No. 401. CALCRIM No. 400 provides that: "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. [¶] A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." CALCRIM No. 401 provides in pertinent part: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

purpose of the person who committed the crime; [¶] AND [¶] 2. He intended to, and did in fact, aid or facilitate the commission of the crime." Although the instruction does discuss the requirement that an accomplice know of a codefendant's "criminal purpose" and have the intent to "aid or facilitate" the crime, nowhere does it make clear that the jury should apply the instruction to an "aider and abettor" as opposed to an "accomplice." The prosecutor did not use the term "accomplice" in closing argument but instead stated that "a person is guilty of a crime if he commits the crime himself or if he personally aided the person who committed that crime. [¶] The evidence in this case is that Jose Gonzalez and Andy Gomez were aiding and abetting each other in committing this act. . . . So that is why Noe Hernandez Garcia is charged identically to Jose Gonzalez and Andy Gomez." Nowhere did the prosecutor indicate that, in addition to aiding Gomez and Gonzalez, Hernandez Garcia also had to *know* of his codefendants' criminal purpose. "[T]he weight of authority and sound law require proof that an aider and abettor act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense. [Citations.]" (*Beeman*, *supra*, 35 Cal.3d at p. 560.) Accordingly, the failure to instruct the jury on aiding and abetting liability was error.

Given that the trial court erred, we must determine whether that error was harmless. In resolving that question, we need not decide whether to evaluate the error under the state law standard of *Watson*, *supra*, 46 Cal.2d at p. 836, as opposed to the federal standard of *Chapman*, *supra*, 386 U.S. at p. 24, because under either standard, the error was not harmless. Even if the more lenient *Watson* standard applied, we find that in this case it is reasonably probable that the jury would have reached a result more favorable to Hernandez Garcia had it been correctly instructed upon the mental element of aiding and abetting.

The Attorney General argues that any error was harmless because "the evidence [was not] susceptible to a conclusion that Hernandez-Garcia [*sic*] acted without

knowledge of his companions' purpose and intent to aid them in achieving it." He also argues that Hernandez Garcia's defense at trial was that he was not present, not that he did not know Gomez and Gonzalez intended to kill anyone. We disagree.

Vasquez testified at trial that Gomez told him that, before the date of the shooting, "[he, Hernandez Garcia, and Gonzalez] went and . . . stake[d] out that area [i.e., Ross Circle]. They . . . dr[o]ve around and . . . get the feel for it, see their entranceways and the ways to get out, get away from it. See if they can see any [] enemies, see where they hanged around." Gomez also told Vasquez that, on the day of the shooting, "They were going to get [Hernandez Garcia] to drive them there. [Hernandez Garcia] was going to stay in the car parked. . . Jose and [Gomez] were going to get off [*sic*] the car and do the shooting and run back to the car." While this testimony supports a conclusion that Hernandez Garcia knew Gomez and Gonzalez intended to locate "enemies" on Ross Circle, it does not indicate Hernandez Garcia knew that Gomez and Gonzalez intended to murder anyone and that Hernandez Garcia intended to assist them in doing so. (*Beeman*, *supra*, 35 Cal.3d at p. 560.)

Accordingly, Hernandez Garcia's conviction on count 1 must be reversed. On remand, the prosecution may retry Hernandez Garcia for first degree murder. (See *People v. Hernandez* (2003) 30 Cal.4th 1, 3 ["As a general rule, the double jeopardy guarantee imposes no limitation on the power to retry a defendant who has succeeded in having his conviction set aside on appeal on grounds other than insufficiency of evidence. [Citation.]".)

### B. Criminal street gang and criminal street gang-related firearm enhancements

Hernandez Garcia and Gomez argue that, because they are entitled to the retroactive application of Assembly Bill No. 333's amendments to section 186.22, effective January 1, 2022, the jury's true findings on both the criminal street gang enhancement allegations (§ 186.22, subd. (b)(5)) and the criminal street gang-related

firearm enhancement allegations (§ 12022.53, subd. (e)) must be vacated.[38]  The

Attorney General agrees that the amended version of section 186.22 applies to both

defendants and that the jury's findings on those allegations must therefore be vacated.

As explained below, we agree with the parties.[39]

### 1. Applicable law and retroactivity

Assembly Bill No. 333 (2021-2022 Reg. Sess.) amended section 186.22, by,

among other things, modifying the definitions of "pattern of criminal activity" and

"criminal street gang," as well as clarifying what is required to establish that an offense

---

[38] Gomez also initially argued that he was entitled to retroactive application of section 1109, which provides that upon request, a gang enhancement shall be tried in a bifurcated proceeding after the defendant's guilt on the underlying offense is determined. (§ 1109, subd. (a); Stats. 2021, ch. 699, § 5.)  In his reply brief, however, Gomez concedes that this argument was foreclosed by the California Supreme Court's decision in *People v. Burgos* (2024) 16 Cal.5th 1, which held that the gang bifurcation provisions of section 1109 do not apply retroactively.  Consequently, we do not address this argument.

[39] In his opening brief, Gomez argued that his trial counsel was ineffective for effectively conceding the truth of the criminal street gang and gang-related firearm enhancement allegations and further that the matter should be remanded so that the trial court could exercise its discretion under newly amended section 1385, subdivision (c) to strike the gang-related firearm enhancements.  Additionally, Hernandez Garcia and Gomez both initially argued that the matter must be remanded so that the trial court could exercise its discretion, as explained by *People v. Tirado* (2022) 12 Cal.5th 688, to impose lesser firearm enhancements under section 12022.53, subdivisions (b) and (c) or section 12022.5, subdivision (a).  In his reply brief, Gomez acknowledges that, by accepting the Attorney General's concession and vacating the criminal street gang and gang-related firearm enhancements, his alternative arguments are now moot.  Hernandez Garcia does not go so far in his reply and maintains that, on remand, the trial court must exercise its discretion to impose lesser firearm enhancements.  However, since we are directing the trial court to vacate the true findings on the firearm enhancement allegations (along with the associated sentence enhancements), the trial court cannot exercise its discretion in a vacuum.  It would only be after the prosecution elects to retry the enhancements and where they are found true by the trier of fact, that the trial court could then exercise its discretion and impose sentence.  We presume the trial court will, under those circumstances, proceed in accordance with current law.

"benefit[s], promote[s], further[s], or assist[s]" a criminal street gang. (Stats. 2021, ch. 699, § 3.)

As explained in *People v. Perez* (2022) 78 Cal.App.5th 192 (*Perez*), "Assembly Bill No. 333 . . . amended section 186.22 by modifying the definitions of 'pattern of criminal activity' and 'criminal street gang,' and it clarified what is required to show an offense 'benefit[s], promote[s], further[s], or assist[s]' a criminal street gang." (*Id.* at p. 206.) Section 186.22 now " 'requires proof of the following additional requirements with respect to predicate offenses: (1) the offenses must have "commonly benefited a criminal street gang" where the "common benefit . . . is more than reputational"; (2) the last predicate offense must have occurred within three years of the date of the currently charged offense; (3) the predicate offenses must be committed on separate occasions or by two or more gang members, as opposed to persons; and (4) the charged offense cannot be used as a predicate offense.' " (*Perez, supra*, at p. 206.) "With respect to common benefit, the new legislation explains: '[T]o benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant.' " (*People v. Lopez* (2021) 73 Cal.App.5th 327, 345.)

Because the changes to the criminal street gang statute in Assembly Bill No. 333 are ameliorative, the California Supreme Court has held that those changes apply retroactively to defendants whose convictions are not yet final. (*People v. Tran* (2022) 13 Cal.5th 1169, 1206–1207 (*Tran*).) Accordingly, Hernandez Garcia and Gomez are entitled to retroactive application of amended section 186.22.

### *2. Analysis*

Because the amended version of section 186.22 retroactively applies to defendants' cases, we must vacate the gang enhancements and gang-related firearm

enhancements unless " 'it appears beyond a reasonable doubt' that the jury [findings] would have been the same" if the jury had been instructed in accordance with currently applicable law. (*Tran, supra*, 13 Cal.5th at p. 1207; *People v. Mil* (2012) 53 Cal.4th 400, 409 [omission of element of charged offense subject to review under *Chapman, supra*, 386 U.S. 18].) We accept the Attorney General's concession that substantial evidence does not support the jury's true findings on the gang enhancement and gang-related firearm allegations under the amended version of section 186.22. The evidence presented at trial did not demonstrate that members of VST collectively engaged in a pattern of criminal gang activity as required by amended section 186.22. (§ 186.22, subds. (b)(1), (e)(1), (g).) We agree with the parties that the record is insufficient to support the heightened proof requirements of amended section 186.22. As a result, we will remand the matter to the trial court to vacate the jury's true findings on the criminal street gang enhancements alleged as to counts 1, 6, and 7 (§ 186.22, subd. (b)(5)) and the gang-related firearm enhancements (§ 12022.53, subd (d)) alleged in connection with count 1.[40]

On remand, the prosecution may seek to retry the gang enhancement and gang-related firearm enhancement allegations and attempt to prove the statutory elements that were not in place at the time of defendants' original trial. Retrial is permissible because

---

[40] As noted above, while both enhancements were also alleged in connection with counts 2 through 5, the jury acquitted the defendants on those charges. Additionally, although neither Hernandez Garcia nor Gomez argued that their convictions for carrying a firearm while being an active member of a criminal street gang (§ 25850, subds. (a), (c)(3); counts 9 and 10) are also invalid due to the changes to section 186.22, the California Supreme Court has held that all the elements in section 186.22, subdivision (a) must be satisfied before the alternative punishment provision of section 25850, subdivision (c)(3) applies. (*People v. Lamas* (2007) 42 Cal.4th 516, 524 [analyzing interplay of § 186.22, subd. (a), with former § 12031, subd. (a)(2)(C) (now § 25850)].) Because we are reversing the defendants' convictions on counts 9 and 10 due to the trial court's failure to instruct the jury on these offenses (*ante*, at section II.A.3.a.), the point is moot.

the intervening changes to section 186.22 differentiate this case from the typical one in which a finding is reversed due to insufficient evidence. (*People v. E.H.* (2022) 75 Cal.App.5th 467, 480; *People v. Figueroa* (1993) 20 Cal.App.4th 65, 71–72.)

### C. Failure to instruct on counts 6, 7, 9, and 10

Gomez argues that the trial court erred by failing to instruct the jury on the elements of: 1) carrying an unregistered loaded firearm in public (§ 25850, subds. (a), (c)(6); count 7); and 2) carrying a firearm while being an active member of a criminal street gang (§ 25850, subds. (a), (c)(3); count 9). Although Hernandez Garcia does not separately raise or expressly join in Gomez's argument, the trial court also failed to instruct the jury on the identical firearm charges alleged against him in counts 6 (§ 25850, subds. (a), (c)(6)) and 10 (§ 25850, subds. (a), (c)(3)). The Attorney General concedes the error, and we agree.[41]

#### 1. Applicable legal principles

We review claims of instructional error de novo. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581, 584.)

" 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' " (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189.) The trial court therefore has a sua sponte duty to instruct the jury on the essential elements of each charged offense. (*Merritt*, *supra*, 2 Cal.5th at p. 824.) "When

---

[41] Because we agree that Gomez's convictions on counts 7 and 9 must be reversed due to instructional error, we need not and do not reach Gomez's alternative arguments, i.e., that these charges violate the Second Amendment of the United States Constitution, that trial counsel was ineffective for conceding a factual basis related to count 9, and that he is entitled to resentencing on counts 7 and 9 based on Senate Bill No. 567's amendments to section 1170.

a court fails to instruct the jury on an element of an offense, the error violates the federal Constitution because a jury must find the defendant guilty of every element of the crime of conviction beyond a reasonable doubt." (*People v. Gonzalez* (2018) 5 Cal.5th 186, 198–199; see *Neder v. United States* (1999) 527 U.S. 1, 8–15 (*Neder*).) Accordingly, "[w]e must determine whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error." (*Merritt*, *supra*, at p. 831; see also *Neder*, *supra*, at pp. 17, 19.)

CALCRIM No. 2530 is the current standard instruction defining the crime of carrying a loaded firearm pursuant to section 25850, subdivision (a), and provides that, in order to convict the defendant, the People must prove: (1) The defendant carried a loaded firearm on his or her person or in a vehicle; (2) The defendant knew that he or she was carrying a firearm; and (3) At the time, the defendant was in a public place or on a public street in an incorporated city or in an unincorporated area where it was unlawful to discharge a firearm. CALCRIM No. 2545 instructs the jury, in relevant part, that if it finds "the defendant guilty of unlawfully carrying a loaded firearm . . . , you must then decide whether the People have proved the additional allegation that the defendant was not the registered owner of the firearm."

### 2. Analysis

For unexplained reasons, the trial court did not instruct the jury with CALCRIM No. 2530 or CALCRIM No. 2545.[42] In addition, none of the parties described the elements of that offense in their closing statements, including the requirement that the People prove that defendants were not the registered owner of the firearms. Under these circumstances, where the trial court failed to instruct the jury on *any* of the elements of

---

[42] The trial court instructed the jury with CALCRIM No. 2542, which addressed the criminal street gang allegation relating to counts 9 and 10. As discussed *ante*, section 186.22 was amended *after* the defendants were convicted, so the instruction given did not conform with the heightened proof requirements of the amended statute.

carrying a loaded firearm in violation of section 25850, we cannot say that it is "clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error." (*Merritt*, *supra*, 2 Cal.5th at p. 831.) Accordingly, we will reverse defendants' convictions on counts 6, 7, 9, and 10.

### D. Exclusion of third party culpability evidence

Gomez[43] argues that the trial court erred by not permitting him to present third party culpability evidence to show that Vasquez, the prosecution's main witness, was involved in the Ross Circle shooting. We disagree.

#### 1. Additional background

During trial, while Vasquez's testimony was ongoing, Hernandez Garcia, joined by Gomez and Gonzalez, filed a motion to permit third party culpability evidence. In this motion, the defense argued that Vasquez had motive and opportunity to commit the Ross Circle shooting and further had made a false statement to the police regarding his whereabouts on the day of the murder.

The court denied the motion, stating: "[T]hird-party evidence that does not raise a reasonable doubt as to the moving party's guilt should be excluded as irrelevant." The court acknowledged that the evidence in question "could possibly inculpate [Vasquez]; however, that evidence does not raise a reasonable doubt as to any of the defendants' guilt." Even if the evidence showed that Vasquez was present at and involved in the shooting, "that doesn't raise a reasonable doubt as to whether any of the defendants who are before this Court were not present."

Despite the court's ruling, Hernandez Garcia's counsel asked Vasquez multiple questions on cross-examination that suggested Vasquez was present and involved in the shooting. While the court sustained the prosecutor's objections to some of these

---

**43** We do not address Hernandez Garcia's arguments on this issue as we are reversing all his convictions for possible retrial.

questions, Vasquez answered others where no objection was raised. At a sidebar outside the jury's presence, the court noted that Hernandez Garcia's counsel had "clearly asked questions that were against my rulings, the questions about the cell phone tower. There were several times that there were objectionable questions when there was no objection." The court then reiterated its ruling, stating, "Third-party culpability questions are inadmissible."

Subsequently, during cross-examination of Norton, the prosecutor's cell phone expert, counsel for Gonzalez and Hernandez Garcia repeatedly asked questions about Vasquez's phone pinging off a cell tower "a thousand feet" from Ross Circle. During his cross-examination, Hernandez Garcia's counsel asked Norton the following: "In your opinion, could the fact that [Vasquez]'s cell phone is in the exact area of the homicide scene some three hours and ten minutes before the homicide be consistent with a person possibly staking out the homicide scene area for potential targets?" The trial court sustained the prosecution's objection that the question violated the "Court's prior rulings," but Hernandez Garcia's counsel asked several more questions about the times that Vasquez's phone was connecting to the cell tower near Ross Circle.

The prosecutor again objected to this line of questioning, and outside the jury's presence argued that Hernandez Garcia's counsel was violating the court's order on third party culpability evidence. The court agreed and informed Hernandez Garcia's counsel "there will be accountability when this trial is over."

Hernandez Garcia's counsel subsequently asked the court to reconsider its ruling precluding evidence of third party culpability, noting that after the prosecution's cell phone expert admitted that it was possible that Vasquez was at Ross Circle at the time of the homicide, the prosecution was allowed to present alibi testimony from L.A. that Vasquez was in fact at his home at the time of the shooting.

After cautioning Hernandez Garcia's counsel that he risked being "fined pursuant to Code of Civil Procedure [section] 177" if he continued to violate the court's rulings,

45

the trial court denied the motion for reconsideration. The court restated its prior conclusion that Vasquez's potential involvement in the shooting did not "raise a question of reasonable doubt as to the defendants."

### 2. Applicable law and standard of review

Only relevant evidence is admissible. (Evid. Code, § 350.) Relevant evidence is "evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.*, § 210.) However, a trial court may exclude otherwise relevant evidence if its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time. (*Id.*, § 352.) Third party culpability evidence is treated just like any other evidence, and is admissible if relevant, unless its probative value is substantially outweighed by the risk of undue prejudice under Evidence Code section 352. (*People v. Lewis* (2001) 26 Cal.4th 334, 372 (*Lewis*).) When considering the admissibility of third party culpability evidence, in general, "evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*People v. Hall* (1986) 41 Cal.3d 826, 833 (*Hall*).) We do not disturb a trial court's discretionary ruling under Evidence Code section 352 unless it has abused its discretion. (*Lewis, supra*, at pp. 372–373.)

### 3. Analysis

At trial, the defendants sought to introduce third party culpability evidence to show that Vasquez had motive and opportunity to commit the Ross Circle shooting and was, in fact, in the area of that shooting at the time it occurred. We find that the trial court did not abuse its discretion in precluding it.

While it is true that Vasquez testified that he had reason to commit a shooting on Ross Circle and the cell phone data showed it was possible he was near the location at the time of the crime, there was no evidence linking him to the shooting itself. None of the

victims identified Vasquez as one of the shooters they saw that night. No one implicated him as being involved in the shooting in any way and the gun found in Vasquez's residence was not one of those stolen from D.B.'s home.

Furthermore, even assuming the evidence was relevant, its probative value on the question of the defendants' guilt was not substantial. Vasquez being involved in the shooting does not raise a reasonable doubt that the other defendants were also involved, especially given the uncontroverted evidence that three people were in the white Jetta.

Ultimately, it is clear that Gomez's "theory of [Vasquez's] culpability would not tend to exculpate [them] in any event." (*Hall*, *supra*, 41 Cal.3d at p. 835.) All the testimony from the victims indicated that there were two people, one of whom was Gomez, who exited the car and began shooting. Therefore, even if there was any testimony identifying Vasquez as the other shooter, his participation in the crime would not raise a reasonable doubt as to Gomez's guilt. The trial court did not abuse its discretion in precluding the third party culpability evidence.

### E. No error in admonishing jury regarding third party motives

Gomez[44] next argues the court erred by instructing the jury, after closing arguments and prior to the prosecutor's rebuttal argument, not to consider third party motives. In Gomez's view, the court's mid-argument instruction violated Evidence Code section 780, subdivision (f), which requires the fact finder to consider as to every witness the "existence or nonexistence of a bias, interest, or other motive."

#### 1. Additional background

Before closing arguments, the trial court admonished counsel that, while they "can comment on the state of the evidence, [] the third-party culpability [evidence] has been excluded and I would expect that counsel will not . . . argue anything that the court has ruled [] inadmissible . . . including but not limited to third-party culpability."

---

[44] See footnote 43, *ante*.

Gonzalez's counsel was the first to present closing argument, during which she specifically argued, "The one person who had a motive, the one person who knew the people on Ross Circle was [Vasquez]." After the trial court sustained the prosecutor's objection and struck that statement, Gonzalez's counsel continued, "[Vasquez] said he wanted to acquire a gun to go buster hunting. . . . He said one of his main focuses was the people on Ross Circle." The prosecutor objected again, and the trial court called a recess to address the matter outside the jury's presence. In that conference, the trial court cautioned Gonzalez's counsel that her statements indicating that Vasquez was " 'the only person who had a motive,' " "sound[] . . . like a third-party culpability argument." The trial court then informed Gonzalez's counsel that it would instruct "the jury that what the lawyers argue is not fact and that they have to decide the facts for themselves." Gonzalez's counsel replied that she did not believe she should be admonished as she was "entitled to argue the evidence in this case and my interpretation of the evidence."

Following the recess, the trial court did not admonish the jury but allowed Gonzalez's counsel to continue her closing argument. Soon thereafter, Gonzalez's counsel returned to her former line of argument, stating that Vasquez wanted to "hurt people," "get a gun," and "go buster hunting" on Ross Circle, eliciting three more objections from the prosecution. In response to the first of these three objections, the trial court reminded the jurors that counsel's statements are not evidence and the jurors "are the sole judges of the evidence." After the second objection, the trial court asked Gonzalez's counsel to "be mindful of the Court's ruling [on third party culpability evidence]." Following the third objection, the trial court called the attorneys to the bench for a sidebar. During that sidebar, the trial court informed the attorneys that it did not sustain the prosecution's most recent objections because Gonzalez's counsel was "quoting the evidence that was admitted" rather than "draw[ing] impermissible arguments from that evidence." The trial court stated that the jury had already been

48

admonished that counsel's statements are not evidence, so it intended to allow counsel to make their closing arguments.

In his closing, Hernandez Garcia's counsel argued that Vasquez's testimony implicating Hernandez Garcia was his "get-out-of-jail-free card," that Vasquez was "beyond unreliable," "not honest," and "had a bias and a motive to lie." Defense counsel further argued that Vasquez "had a motive to target persons on Ross Circle." The prosecutor did not object during Hernandez Garcia's closing.

However, after Hernandez Garcia's counsel concluded, the prosecutor asked the trial court to admonish the jury based on the third party culpability arguments made by Hernandez Garcia's counsel and Gonzalez's counsel. The prosecutor noted that she did not object to "the third-party culpability arguments" made by Hernandez Garcia's counsel because the objections she made during Gonzalez's closing "ended up delaying our proceedings." The court indicated that it was considering giving an instruction on the evidence but "because [Vasquez] is such an important part in this case," it was concerned about how to phrase its admonition. To that end, the trial court indicated that it would "think about . . . how I'll phrase that [admonition] to the jury, if I do."

After Gomez's counsel delivered his closing argument but before the prosecutor's rebuttal, the court instructed the jury as follows: "Let me remind you that what the attorneys say is not evidence. I'll remind you that you are the sole judges of the facts. And you are to weigh and consider all evidence in the case. [¶] . . . [B]ased on prior rulings, you are not to consider the motive or lack thereof of any third [party]—any other parties other than the parties that are charged."

After the jury left the courtroom to begin deliberations, defense counsel jointly objected to the court's mid-argument instruction regarding motive. Counsel argued the instruction "nullif[ied] the arguments of defense counsel, that [the jury] can interpret the evidence regarding the motive for [Vasquez]" to implicate the three defendants. The instruction "is suggesting to the jury how they should interpret this evidence."

49

Counsel added that the court "somewhat blind-sided" defendants with the instruction since it did not tell the parties what it intended to say beforehand. Also, the instruction "flies in the face of admissible evidence that was received into evidence . . . and also reasonable inferences that flow[] therefrom." Finally, defense counsel argued the instruction violated their clients' constitutional due process rights, the right to present a defense, and the right to a fair trial.

The trial court reminded counsel that it would admonish the jury "if improper arguments were made" but that they "were allowed to comment on the evidence." The court's instruction to the jury was that "they are to consider all of the evidence and that they can consider whether or not [Vasquez] lied . . . [b]ut with regard to third party motives and, specifically, with [the] motive to commit the crime, that is not an issue for the jury."

### 2. Applicable law and standard of review

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review." (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) When we review a purportedly erroneous instruction, we consider " ' " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." ' " (*People v. Richardson* (2008) 43 Cal.4th 959, 1028 (*Richardson*).) We consider the instructions as a whole and " 'assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' " (*Ibid.*) "Generally, the trial court is required to instruct the jury on the general principles of law that are closely and openly connected with the evidence and that are necessary to the jury's understanding of the case. [Citation.] It also has a duty to refrain from giving incorrect instructions or instructions on principles of law that are irrelevant and that would have the effect of confusing the jury or relieving it from making findings on the relevant issues." (*Barber*, *supra*, 55 Cal.App.5th at p. 799.)

50

### 3. Analysis

Considering the instructions as a whole, there is no reasonable likelihood the jury would have understood the court's mid-argument instruction to mean that it could not consider Vasquez's motive to lie. Prior to deliberating, the jurors were instructed with CALCRIM No. 226 regarding factors they might consider in evaluating a witness's testimony, including whether "the witness's testimony [was] influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided"; did the witness "make a statement in the past that is consistent or inconsistent with his or her testimony"; as well as whether the witness admitted to being untruthful, had been convicted of a felony, or was "promised immunity or leniency in exchange for his or her testimony." The jury was also instructed with CALCRIM No. 370 on motive, as follows: "The People are not required to prove that the defendants had a motive to commit any of the crimes charged. In reaching your verdict you may, however, consider whether the defendant had a motive. [¶] Having a motive may be a factor tending to show that the defendants are guilty [or] that certain allegations are true. Not having a motive may be a factor tending to show that defendants are not guilty or that certain allegations are not true."

It is not reasonably probable that the jury understood the court's mid-argument instruction to mean that they could not consider whether Vasquez had a motive to lie, but rather that they could not consider whether Vasquez (or any other third party) had a motive to commit the Ross Circle shooting. We note that the prosecutor only objected during Gonzalez's closing argument, not during Hernandez Garcia's[45] or Gomez's. Nevertheless, all three defense counsel argued repeatedly and forcefully to the jury that

---

[45] Again, before Gomez's counsel gave his closing argument, the prosecutor explained that she did not object to improper statements about third party culpability made in Hernandez Garcia's closing argument because her objections to similar statements during Gonzalez's closing argument "delay[ed] our proceedings."

51

there was ample evidence presented at trial to show that Vasquez was not a credible witness and that he had a motive to lie. It is worth noting that, although Vasquez testified that Gonzalez was directly involved in the shooting, the jury acquitted Gonzalez on all counts, which suggests that the mid-argument instruction did not deter the jury from finding that Vasquez not only had a motive to lie but that he *actually* lied. Considering the instructions as a whole and the arguments presented by counsel, we cannot say that the court's instruction "would have the effect of confusing the jury or relieving it from making findings on the relevant issues." (*Barber*, *supra*, 55 Cal.App.5th at p. 799.)

Because we conclude there is no " ' " 'reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution[]" ' " (*Richardson*, *supra*, 43 Cal.4th at p. 1028), we reject Gomez's claim that the instruction violated his constitutional rights.

### F. Admission of Gomez's uncharged conduct as predicate offense

Gomez argues the trial court erred in admitting evidence of his stabbing of a then-15-year-old, J.F., to prove both the gang enhancement allegations as well as the offense of carrying a firearm while an active participant in a criminal street gang (count 9). We disagree.

#### 1. Additional background

Before trial, the prosecutor moved in limine to introduce, among other things, evidence of Gomez's stabbing of J.F. as one of the predicate offenses to prove: 1) that VST was a criminal street gang; and 2) Gomez was an active participant in VST and knew that VST engaged in a pattern of criminal gang activity. The trial court initially

52

excluded that evidence but later ruled that it was admissible, over Gomez's Evidence Code section 352 objection.[46]

Gomez subsequently offered to stipulate to admit into evidence the "gang abatement materials" discovered during the search of Gomez's residence to show his knowledge that VST engaged in criminal activities, in exchange for excluding the evidence of the J.F. stabbing. Because Gomez shared his residence with other VST members and there was no evidence that Gomez actually read those materials, the prosecutor refused to stipulate. Gomez then offered to stipulate that he had read the letter and knew its contents, but after considering the matter further, the prosecutor declined to "trade indisputable evidence with disputable evidence to prove up a disputed fact." The prosecutor also pointed out that the gang abatement materials discussed offenses that took place in the late 1990s up to 2001, whereas the J.F. stabbing took place in 2008, three years before the Ross Circle shooting. The court reaffirmed its ruling that, notwithstanding Gomez's Evidence Code section 352 objection, J.F. would be allowed to testify.

J.F. testified that he did not recall any of the details about the stabbing incident and did not recall any of the statements he made to the police at the time.[47] The prosecution subsequently called the responding officer who testified as to what she

---

[46] During the parties many discussions about this evidence with the court, neither the trial court nor any of the attorneys indicated whether this evidence was offered pursuant to Evidence Code section 1101, subdivision (b) or under some other statute. Evidence Code section 1101, subdivision (b), as relevant here, allows for the admission of evidence to show that "a person committed a crime . . . or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act."

[47] Over defendants' objections, the court admitted into evidence certified records consisting of the juvenile petition filed against Gomez for assault with a deadly weapon and his sustained plea to that offense.

observed as well as what J.F. told her at the time of the incident. In sum, the officer testified that J.F. told her that Gomez walked up to him and his friends and asked if they "bang[ed]." When J.F. said he did not, Gomez replied " 'This is VST,' " then stabbed J.F. in the back as J.F. walked away. Detective Ashe subsequently testified that, based in part on this stabbing, Gomez was in his opinion an active member and participant in VST.

### 2. Applicable law and standard of review[48]

In *People v. Tran* (2011) 51 Cal.4th 1040, 1046, the California Supreme Court held that, in cases brought under the California Street Terrorism Enforcement and Prevention Act (the STEP Act; § 186.20 et seq.), "a predicate offense [can] be established by proof of an offense the defendant committed on a separate occasion."

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." " '[A] court need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing functions under Evidence Code section 352.' " (*People v. Doolin* (2009) 45 Cal.4th 390, 438.) "We review a trial court's decision to admit evidence under Evidence Code section 352 for abuse of discretion, and 'do not disturb the trial court's ruling unless it was arbitrary, capricious, or made in a " 'patently absurd manner that resulted in a manifest miscarriage of justice.' " ' [Citations.]" (*People v. Lamb* (2024) 16 Cal.5th 400, 424.)

---

**48** Because Gomez concedes that the evidence of his 2008 assault on J.F. was relevant, we examine only whether the trial court erred by not excluding that evidence pursuant to Evidence Code section 352.

### 3. Analysis

As the California Supreme Court instructed in *People v. Tran*, "In cases . . . where evidence [of an uncharged act] is admitted under Evidence Code section 1101, subdivision (b), the evidence is probative because of its tendency to establish an *intermediary fact* from which the ultimate fact of guilt of a charged crime may be inferred. [Citations.] In prosecutions for active participation in a criminal street gang, the probative value of evidence of a defendant's gang-related separate offense generally is greater because it provides direct proof of several *ultimate facts* necessary to a conviction. Thus, that the defendant committed a gang-related offense on a separate occasion provides direct evidence of a predicate offense, that the defendant actively participated in the criminal street gang, and that the defendant knew the gang engaged in a pattern of criminal gang activity." (*People v. Tran*, *supra*, 51 Cal.4th at p. 1048.)

As discussed in *People v. Tran*, "[t]he probative value of the evidence is enhanced if it emanates from a source independent of evidence of the charged offense because the risk that the witness's account was influenced by knowledge of the charged offense is thereby eliminated. [Citation.] On the other hand, the prejudicial effect of the evidence is increased if the uncharged acts did not result in a criminal conviction. This is because the jury might be inclined to punish the defendant for the uncharged acts regardless of whether it considers the defendant guilty of the charged offense and because the absence of a conviction increases the likelihood of confusing the issues, in that the jury will have to determine whether the uncharged acts occurred. [Citation.] The potential for prejudice is decreased, however, when testimony describing the defendant's uncharged acts is no stronger or more inflammatory than the testimony concerning the charged offense. [Citation.]" (*People v. Tran*, *supra*, 51 Cal.4th at p. 1047.)

In this case, the trial court did not abuse its discretion under Evidence Code section 352 in admitting the evidence of Gomez's prior attack on J.F. as evidence of a predicate offense. The evidence of that offense came from the testimony of the officer

who responded to the report of the stabbing, the juvenile petition that was filed in connection with that assault, and the sustained plea to that juvenile petition. There was thus no risk that the responding officer's account of what J.F. told her at the time was in any way influenced by knowledge of the charged offenses. Because the petition was sustained, there could be no increase in the prejudicial effect in that the jury would be confused as to whether it would have to decide if the uncharged act took place or that it would feel some pressure to punish Gomez for that prior assault. (*People v. Tran*, *supra*, 51 Cal.4th at p. 1047.) In addition, the evidence about the 2008 J.F. stabbing was much less inflammatory than the evidence of the shooting in this case.[49]

### G. Franklin hearing

Gomez argues that, as he was 19 years old when he committed the murder in this case, he is entitled to a youth offender parole hearing under section 3051, subdivision (a), which applies to those who were 25 or younger at the time of the crime.[50] The Attorney General argues, citing *People v. Medrano* (2019) 40 Cal.App.5th 961 (*Medrano*), that Gomez has forfeited the opportunity to request a *Franklin* hearing because he failed to do so at the time of his 2019 sentencing, which took place three years after section 3051 was amended to extend its provisions to persons under 23 years of age at the time of the controlling offense (see Stats 2015, ch. 471, § 1 (Sen. Bill 261), effective Jan. 1, 2016) and three years after *Franklin* was decided. Because we are remanding the matter for possible retrial of the gang enhancement and gang-related firearm enhancement

---

[49] We also note that the jury was specifically instructed with CALCRIM No. 1403 on the limited purpose of the 2008 assault with a deadly weapon and that it could not use that evidence as proof of Gomez's bad character or criminal disposition.

[50] This hearing is also referred to as a "*Franklin* hearing." In *Franklin*, *supra*, 63 Cal.4th 261, the California Supreme Court held that a person entitled to a youth offender parole hearing under section 3051 has a right to make a record of evidence of his characteristics and circumstances for use at the eventual parole hearing. (*Franklin*, *supra*, at pp. 283–284.)

allegations and resentencing, Gomez should be permitted, if he so desires, to request a *Franklin* hearing after the matter is remanded below.

In *Medrano*, the defendant was sentenced in 2017 but had failed to make a record of mitigating youth-related evidence for any future parole hearing. (*Medrano*, *supra*, 40 Cal.App.5th at p. 963.) The court declined to remand the case for a *Franklin* hearing but instead affirmed the judgment without prejudice to allow the defendant to file a motion in the trial court under section 1203.01 requesting such a hearing. (*Medrano*, *supra*, at p. 968.)

We find *Medrano* is distinguishable because, in that case, the court of appeal affirmed the defendant's conviction and thus did not remand the case. Here, because we are already remanding to the court for possible retrial and resentencing, it is unnecessary to require Gomez to file a separate motion in the trial court under section 1203.01 to obtain a *Franklin* hearing. Instead, on remand, we direct the trial court to conduct a *Franklin* hearing if Gomez requests one. If he does, then both parties should be permitted "to put on the record any relevant evidence that demonstrates [Gomez's] 'culpability or cognitive maturity, or otherwise bears on the influence of youth-related factors.' " (*In re Loza* (2018) 27 Cal.App.5th 797, 807.)

### H. Cumulative error

Gomez[51] argues that even if any errors identified in this case were individually harmless, the cumulative effect of those errors rendered the trial so fundamentally unfair as to deny his right to due process. We disagree.

Under the "cumulative error" doctrine, "a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844 (*Hill*).)

---

[51] See footnote 43, *ante*.

"The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' " (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)

"Lengthy criminal trials are rarely perfect, and this court will not reverse a judgment absent a clear showing of a miscarriage of justice." (*Hill, supra*, 17 Cal.4th at p. 844.) This trial was no exception. We have concluded that certain changes in the law, specifically the changes to the sentencing provisions of section 1170, as well as the changes to the law relating to criminal street gangs, require that we reverse certain of Gomez's convictions. The only error we have identified, as to his convictions, was the failure to instruct the jury on the elements of Gomez's firearm offenses and we will reverse those convictions and remand for possible retrial on those, along with the gang enhancement allegations and gang-related firearm enhancement allegations.

## I. Response to Jury Note No. 6

Gomez[52] argues the trial court erred by refusing to provide an exhibit, specifically People's Exhibit 193-A, to the jury as was requested in Jury Note No. 6. The Attorney General argues that Gomez has forfeited this argument by failing to raise it at trial. Alternatively, he contends that the jury was not entitled to this exhibit as it was not admitted into evidence. We agree that Gomez has forfeited this error by failing to object, but even if we were to consider the claim, we would find that any error was harmless.

### 1. Additional background

On September 22, 2017, during deliberations, the jury sent a note to the trial court (Jury Note No. 6) stating, "[People's Exhibit No.] 193 is in Spanish, we either need the translation ([People's Exhibit No.] 193A) or the use of a Spanish translator. We believe we are not allowed to translate this ourselves." People's Exhibit No. 193 was the recording of a portion of the conversation between Hernandez Garcia and Gomez in the police station, and that conversation was entirely in Spanish. During trial, the recording

---

[52] See footnote 43, *ante*.

was played for the jury and People's Exhibit No. 193A consisted of the transcript of the conversation with both the original Spanish as well as an English-language translation. While the recording (People's Exhibit No. 193) was admitted into evidence, the transcript (People's Exhibit No. 193A) was not. Defense Exhibit CCC—a translation of the relevant portions of the recorded conversation prepared by defense witness Trajtemberg, a certified Spanish interpreter employed by the Santa Clara County Superior Court—was admitted into evidence.

The September 25, 2017 minute order indicates that, after receiving Jury Note No. 6, the court contacted all counsel and prepared a response.[53] The court response was, as follows: "You are correct, you must accept the evidence as received and not translate for yourselves. We cannot provide an interpreter. You are the judges of the facts as you determine them to be."

### 2. Applicable law and standard of review

Section 1138 provides that when the jury "desire[s] to be informed on any point of law arising in the case . . . the information required must be given." "Where the original instructions [to the jury] are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.) In responding to a request for further instruction, the court "must at least *consider* how it can best aid the jury. . . [and] should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given." (*Ibid.*) As with the trial court's initial instructions, the correctness of the trial court's response to a jury's request for supplemental instruction "presents a question of law that we review de novo." (*People v. Franklin* (2018) 21 Cal.App.5th 881, 887, fn. 4.) "When an

---

[53] The minute order reads: "Question #6 is received from the jury. Attorneys are contacted and a response is formulated." There is no transcript of the discussion between counsel and the court regarding Jury Note No. 6.

appellate court addresses a claim of jury misinstruction, it must assess the instructions as a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner." (*People v. Wilson* (2008) 44 Cal.4th 758, 803.) "We of course presume 'that jurors understand and follow the court's instructions.' " (*Ibid.*)

"A defendant may forfeit an objection to the court's response to a jury inquiry through counsel's consent, or invitation or tacit approval of, that response. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193 [36 Cal. Rptr. 2d 235, 885 P.2d 1] ['Inasmuch as defendant both suggested and consented to the responses given by the court, the claim of error has been waived.']; *People v. Hughes* (2002) 27 Cal.4th 287, 402 [116 Cal. Rptr. 2d 401, 39 P.3d 432] [claim of error was 'waived by defense counsel's agreement with the trial court that informing the jury of the consequences of a deadlock would have been improper']; *People v. Bohana* (2000) 84 Cal.App.4th 360, 373 [100 Cal. Rptr. 2d 845] [counsel invited and consented to failure to instruct on lesser offenses in response to jury inquiry]; *People v. Thoi* (1989) 213 Cal.App.3d 689, 698 [261 Cal. Rptr. 789] [error invited or waived, where counsel 'actively and vigorously lobbied against further instruction']; *People v. Kageler* (1973) 32 Cal.App.3d 738, 746 [108 Cal. Rptr. 235] [where clarification would have adversely affected defense, failure to object had possible tactical motive and could be viewed as ' "tacit approval" '].)" (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1048.)

### 3. Analysis

Here, the record shows that defense counsel were contacted about Jury Note No. 6 and, apparently in consultation with the trial court, "a response [was] formulated." We have no record of what was discussed at this conference, whether defense counsel objected to or agreed to the response that was given to Jury Note No. 6, or whether defense counsel suggested alternative responses.

60

" 'It is well settled that no objection is required to preserve a claim for appellate review that the jury instructions omitted an essential element of the charge.' [Citation.] However, ' "a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." ' [Citation.]" (*People v. Atkins* (2019) 31 Cal.App.5th 963, 979.)  The purported failure to provide the requested exhibit was not tantamount to omitting an essential element of the charges against the defendants. Instead, defendants' claim is that the court's response, in which it declined to provide an exhibit which had not been admitted into evidence, was incomplete.  Without a record of whether defendants made any such argument below or offered any alternative response to Jury Note No. 6, we find they have forfeited the purported error.

However, even if we were to consider the claim of error, we would find that it was harmless beyond a reasonable doubt.  Although People's Exhibit No. 193A was not admitted into evidence, Defense Exhibit CCC was.  Defense Exhibit CCC was a translation of the relevant portions of the recorded conversation prepared *for the defense* by a certified Spanish interpreter.  Thus, the jury had access to an English-language translation of the recorded conversation, as well as Jimenez's testimony as to the contents of that conversation.

### J. Motion for new trial

Gomez[54] argues the court erred in denying his motion for new trial based on the allegations of juror misconduct, specifically that one or more jurors, who spoke some Spanish, offered their own translation of the audio in People's Exhibit No. 193.  We disagree.

---

[54] See footnote 43, *ante*.

### 1. Additional background

The jury began deliberations on September 20, 2017.  As discussed above, on September 22, 2017, the jury sent Jury Note No. 6, asking for the translation of People's Exhibit No. 193 or a Spanish-language translator to provide that translation.  The court, after consulting with counsel, informed the jury that an interpreter could not be provided, but the jurors must "not translate for yourselves."  The jury returned its verdicts on September 29, 2017.

On May 9, 2019, Hernandez Garcia, joined by Gomez, filed a motion for new trial based on juror misconduct for translating the February 6, 2012 recorded conversation during deliberations.  At the hearings on the new trial motion, on March 15 and May 24, 2019, each of the jurors was called, sworn, and questioned by the parties.[55]

#### a. Jurors' testimony

The parties first examined Juror No. 9, who testified that he "believe[d]" Juror Nos. 4 and 6 translated the recording of defendants at the police station for the other jurors.  The recordings were played "over and over, maybe two—three . . . times."  Juror No. 9 did not know "to what extent" those two jurors translated the recordings, as it was "about a year and a half" ago.  He believed that the translations took place before the jury sent out the note asking for the exhibit with the English translation but was not "a hundred percent sure."  Ultimately, Juror No. 9 thought that, when it came to the translation of the conversation, he did not speak Spanish so he "went back to Detective Jimenez and relied on his testimony as to what was said."

Juror No. 9 did not recall his prior conversations with Hernandez Garcia's counsel or his investigator about the jury deliberations, but he remembered not agreeing to sign an affidavit because those were "[Hernandez Garcia's counsel's] words, not mine."

---

[55] Four of the jurors (Juror Nos. 10 and 11 as well as Alternate Juror Nos. 1 and 2) testified they had no recollection of any juror translating anything during deliberations.  Juror No. 1 did not recall that the recording was played at any time during deliberations.

Juror No. 4 testified he spoke Spanish, but not fluently, since he was Cuban and does not have "people that [he] speak[s] it with all the time." Juror No. 4 remembered the recorded interview of Gomez and Hernandez Garcia speaking Spanish, but he does not believe that he translated anything from that video for the other jurors. He remembered there was "conversation around the video" and, as to a Spanish word on the recording, Juror No. 6 "may have said, oh, that, I think, means 'X.' " Juror No. 4 said that the jurors decided they needed a translator and sent the note out to the judge. Juror No. 4 confirmed that nothing in the deliberation room was "different from what [he] observed or heard or witnessed in the trial" with respect to the translation of the recording. He also confirmed that the jury was "very clear" about following the court's instructions.

Juror No. 8 testified that she recalled "playing the [recording] over and over" but cannot recall if any of the jurors translated the Spanish into English. She did not recall any transcript other than that provided by the court reporter. Juror No. 8 remembered seeing Defense Exhibit CCC during the trial but could not remember if she saw it during deliberations.[56] After the trial court declined to provide People's Exhibit 193A, Juror No. 8 recalls that the jurors "tried to . . . piece together [the translation] based on [their] notes," and she did not recall any juror providing their own translations. To the best of Juror No. 8's recollection, "the defense had someone on the stand with their version of the translation[] [and] . . . the prosecution had someone on the stand with their version of the translation." Juror No. 8 did not prepare the declaration she signed after meeting with the defense investigator and did not recall its contents. She agreed that she would not have signed it if it was not accurate but could not confirm that it was "complete" as she only answered the questions the investigator asked.

---

[56] At this point in Juror No. 8's testimony, the trial court confirmed with the clerk that Defense Exhibit CCC was sent into the jury room during deliberations.

Juror No. 7 thought at least one juror indicated that they spoke Spanish, but no juror tried to interpret or "retranslate" what the defendants said in the recording. That juror "tried to listen to the recording multiple times[] [a]nd just mentioned that they can't really tell what's being said in [Spanish]" because the "audio recording quality was kind of poor." Juror No. 7 said that a smaller group of jurors watched the recording "at least one time, maybe two or three times."

Juror No. 2 testified that Juror No. 6 spoke Spanish but did not translate anything from the recording for the other jurors because they followed the court's instruction. Juror No. 2 recalled there was some discussion about the conflicting versions of what defendants said during the recorded conversation, but they did not ask Juror No. 6 to translate. Juror No. 2 did not recall having Defense Exhibit CCC in the jury room during deliberations and her memory was that the jurors had "no [English] translation at all."

Juror No. 5 remembered that at least one juror, Juror No. 6, spoke Spanish. Juror No. 5 thought there was some discussion as to what Juror No. 6 "might have thought" a word meant but did not think that Juror No. 6 gave an opinion. Juror No. 5 recalled that they "spen[t] a good amount of time understanding through the notes that we took [during trial] what that recording meant" based on the translations that were offered at trial. Juror No. 5 emphasized that, even if Juror No. 6 "would have given an interpretation, that would not have been taken into consideration for our deliberations, because that is not something that was discussed in the courtroom."

Juror No. 6 testified that she came to the United States from Mexico when she was nine months old and can read and write in Spanish. Juror No. 6 remembered listening to the audio of the recorded conversation and tried to translate what was being said but the audio quality was poor and defendants "mumbled." She did not remember if her translation of anything was different from the evidence presented in court about what the defendants said. Juror No. 6 recalled translating the word "keys" from Spanish to English but could not remember translating anything else. When shown a copy of

64

Defense Exhibit CCC, she remembered seeing it in the courtroom but "not necessarily in the deliberating room." Juror No. 6 recalled that there was a dispute at trial between the defense witness and the prosecution witness about what the defendants said in the recording, but she did not believe she translated anything relating to that disagreement. When shown a portion of the exhibit reflecting Hernandez Garcia telling Gomez, " 'Well, the thing is they found the key on me, dude,' " Juror No. 6 believed that this was the part of the conversation where she translated the word "key" or "keys."

Juror No. 12 knew that Juror No. 6 spoke Spanish and remembered Juror No. 6 "listening very carefully to the audio recording." Juror No. 12 did not recall what Juror No. 6 said, if anything, afterward. Juror No. 12 said it sounded familiar that, during trial, the defense and the prosecution offered "competing versions" of what the defendants said in the recording but could not remember specifics.

Juror No. 3 remembered that, at trial, "each side presented their interpretation" of what the defendants said in the audio recording. He did not remember seeing Defense Exhibit CCC but remembered that the jury "only had one side" and "did not get the information from both prosecution and defense." The jurors were "trying to compare all of our notes, as well as to what we heard originally in testimony." Juror No. 3 remembered a female juror listening to the recording and telling the English-speaking jurors what she was hearing. According to Juror No. 3, the Spanish-speaking juror's information was used to "try to match up what [the jurors] heard in the courtroom, and what we all had in our notes."

### b. Denial of new trial motion

On May 31, 2019, the court heard the parties' arguments relating to the motion for new trial. The court stated that it was "clear that there was misconduct by Juror No. 6," but after hearing counsels' arguments and "considering the entire record," denied the motion for new trial.

The court summarized its ruling, as follows: "Based on the entirety of the record, based on looking at all of the surrounding circumstances, speaking to the jurors, and reviewing what the jurors had in their deliberation, the Court finds the translation or the attempted translation was not inherently biassed [*sic*]; did not go to a material issue; did not contradict an asserted defense; did not lesson [*sic*] the People's burden; did not affect any jurors' impartiality, and the translated words did not prejudice either defendant." The court specifically noted that "the only transcript [with an English translation] that was sent back [to the jury room] was . . . the defense transcript."

### 2. Applicable law and standard of review

Under section 1181, a defendant may move for a new trial on several different grounds, one of which is that the jury received any evidence out of court. (§ 1181, subd. 2.) When reviewing the trial court's denial of a motion for new trial based on juror misconduct, we accept a trial court's factual findings and credibility determinations, including as to whether misconduct occurred, "if they are supported by substantial evidence," but we exercise "independent judgment to determine whether any misconduct was prejudicial. [Citations.] . . . Juror misconduct raises a rebuttable presumption of prejudice; a trial court presented with competent evidence of juror misconduct must consider whether the evidence suggests a substantial likelihood that one or more jurors were biased by the misconduct." (*People v. Dykes* (2009) 46 Cal.4th 731, 809 (*Dykes*); *People v. Tafoya* (2007) 42 Cal.4th 147, 194–195 [finding that substantial evidence supported trial court's finding that no misconduct occurred] (*Tafoya*).) It is misconduct for a juror to rely on his or her own translation instead of the interpreter's translation. (*People v. Cabrera* (1991) 230 Cal.App.3d 300, 303–304.) Our Supreme Court has instructed "that before a unanimous verdict is set aside, the likelihood of bias under either test must be *substantial*." (*In re Carpenter* (1995) 9 Cal.4th 634, 654.) "The evaluation of [juror] bias presents a mixed question of law and fact on appeal, the resolution of which obliges this court to review the trial court's examination and the juror's responses.

66

[Citation.]" (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 485.) "[W]e uphold a trial court's findings of fact and determinations of credibility when supported by substantial evidence. [Citation.]" (*Tafoya*, *supra*, at p. 194.)

### 3. Analysis

In this case, we find that the trial court's factual findings are supported by substantial evidence and, based on our independent review, we conclude that any misconduct was not prejudicial. First, none of the jurors testified at the evidentiary hearing on the motion for new trial that Juror No. 6 or any other juror[57] translated the defendants' conversation about the car, specifically as to whether Gomez told Hernandez Garcia that he should have gotten rid of his car (i.e., the white Jetta implicated in the shooting) and purchased a different car.

Juror No. 6 admitted only to translating the word "keys," and did not remember translating anything else, particularly about buying, selling, or getting rid of a car. Her account was echoed by Juror Nos. 4 and 5, who testified that Juror No. 6 said something about what she thought a particular word meant, though neither could remember what that word was. Juror Nos. 4 and 5 also testified that the jury followed the court's instruction not to consider anything in deliberations that had not been presented as evidence in the courtroom.

Juror No. 7 testified that no one retranslated anything although a juror listened to the recording "multiple times" and remarked they could not tell what was being said by the defendants. Juror Nos. 12 and 3 remembered that Juror No. 6 listened carefully to the recording, but neither juror could recall her saying what, if anything, she heard them say.

---

[57] Juror No. 9 testified that Juror No. 4 translated something but could not remember what. Juror No. 4 denied translating anything. The trial court stated, "Juror No. 6 and possibly Juror No. 9, either translated or attempted to translate." We presume the trial court meant Juror No. 4 who admitted to speaking some Spanish, though "rusty," and not Juror No. 9 who testified that he "[knew] a few words, but [did not] speak Spanish."

Several other jurors, specifically Juror Nos. 2, 8, 10, 11 and Alternate Juror Nos. 1 and 2,[58] testified that Juror No. 6 did not translate anything in deliberations and that they relied on their notes from the trial to evaluate what the defendants said in the recording.

Given Juror No. 6's admission that she independently translated the word for "key" or "keys" during deliberations, the trial court's finding that Juror No. 6 committed misconduct is supported by substantial evidence. (*Tafoya*, *supra*, 42 Cal.4th at pp. 194–195.) We therefore must exercise our "independent judgment to determine whether any misconduct was prejudicial. [Citations.]" (*Dykes*, *supra*, 46 Cal.4th at p. 809.) We conclude it was not.

There was no dispute at trial that Hernandez Garcia told Gomez that the police had found the keys to his car. There was no evidence that Juror No. 6 or any other juror told the non-Spanish-speaking jurors that Gomez told Hernandez Garcia he should have gotten rid of his car or should have purchased a different car. Six of the jurors testified that Juror No. 6 did not translate anything in deliberations, and three other jurors (Juror Nos. 3, 7, and 12) testified that a juror listened to the recording multiple times but did not testify that she translated any of the Spanish that was spoken on that recording. Even the two jurors (Juror Nos. 4 and 5) who said that Juror No. 6 volunteered what she thought a particular Spanish word meant, testified that they could not remember what that word was and further that the jury did not consider anything in deliberations that had not been admitted into evidence during the trial.

Based on our independent review of the record, we conclude there was no "substantial likelihood that one or more jurors were biased by [Juror No. 6's] misconduct." (*Dykes*, *supra*, 46 Cal.4th at p. 809.)

---

[58] The parties stipulated that the alternate jurors could sit in during deliberations. The court instructed the alternates that they could not participate in selecting a foreman or in the actual deliberations.

### III.   DISPOSITION

The judgments are reversed.  As to defendant Noe Hernandez Garcia, the trial court is directed to vacate his convictions for first degree murder (count 1), carrying an unregistered firearm (count 6), and being a criminal street gang member in possession of a loaded firearm in public (count 10).  As to defendant Andy Gomez, the trial court is directed to vacate his convictions on counts 7 and 9, the true findings on the gang allegations under Penal Code section 186.22, as well as the gang-related firearm allegation under Penal Code section 12022.53, subdivision (d) associated with counts 1, 7, and 9.

On remand, the prosecutor may retry defendant Noe Hernandez Garcia on counts 1, 6, and 10 as well as the gang enhancement allegations and the gang-related firearm enhancement allegation associated with those counts.

In addition, the prosecutor may retry defendant Andy Gomez on counts 7 and 9, as well as the gang enhancement allegations and the gang-related firearm enhancement allegation.

If the prosecutor elects not to proceed with retrials, or at the conclusion of the retrials, the trial court shall resentence defendants under current law.

Defendant Andy Gomez may request a *Franklin* hearing in connection with any subsequent resentencing proceeding.

69

_____
WILSON, J.

WE CONCUR:



_____
GROVER, ACTING P. J.




_____
LIE, J.




*The People v. Hernandez Garcia*
**H047489**
*The People v. Gomez*
**H047844**